FILED

2018 Sep-06  AM 11:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ALABAMA CENTER FOR SUSTAINABLE ENERGY d/b/a ENERGY ALABAMA, FRIENDS OF THE EARTH, GASP, and SOUTHERN ALLIANCE FOR CLEAN ENERGY, <br><br>                    Plaintiffs, <br><br>        v. <br><br> TENNESSEE VALLEY AUTHORITY, <br><br>                    Defendant. | Civil Action No.:_____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This suit challenges the Tennessee Valley Authority's ("TVA") new rate structure, in which TVA is discouraging businesses and homeowners from investing in renewable energy and energy efficiency measures.  The growth in solar energy systems, energy efficiency, and other forms of Distributed Energy Resources, including energy storage— collectively called "DER" —will inevitably reduce demand for TVA-generated electricity, from which TVA derives its income.  In response to this competition, TVA's "2018 Anti-Solar Rate Changes" are designed to discourage the development of DER in three primary ways.  First, the Rate Changes reduce electricity rates for large commercial customers, thus removing financial advantages of DER investment.  Second, the Rate Changes—for the first time—impose a Grid Access Charge ("GAC") which will require Local Power Companies to charge residential and small business customers a mandatory fee regardless of electricity usage, thereby impeding DER adoption in this customer class.  Finally, TVA is discounting the price of electricity for greater

electricity usage, discriminating against consumers who consume less energy or who implement energy efficiency measures. Taken together, these measures are designed to obstruct DER adoption across all customer classes, in order to maximize the amount of electricity customers continue to obtain from TVA—primarily dirty electricity derived from coal and other polluting energy sources.

2.      The National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA") — our "national charter for protection of the environment," 40 C.F.R. § 1500—requires that federal agencies like TVA prepare an Environmental Impact Statement ("EIS") for any decision that may have a significant impact on the environment.  Where an agency is uncertain whether an EIS is required, it may first prepare an Environmental Assessment ("EA") to aid in that determination.  *See generally* 50 C.F.R. Part 1500.

3.      Before approving these Anti-Solar Rate Changes, TVA purported to comply with NEPA by preparing an EA and issuing a Finding of No Significant Impact ("FONSI"). However, although TVA is imposing these Anti-Solar Rate Changes to further its customers' continued reliance on TVA-generated power, TVA incongruously concluded that the Rate Changes will have no discernible impacts on the environment.

4.      In addition, the EA and FONSI entirely ignored that, at the same time these rate changes are being made, TVA has also made a separate Anti-Solar Rate Change that will even further discourage distributed generation ("DG"), reducing how much TVA pays for the electricity generated by DG customers ("DG Rates").

5.      TVA is violating NEPA by failing to disclose and consider the reasonably foreseeable environmental impacts of all of these Anti-Solar Rate Changes.  In addition, because these changes will have significant environmental impacts, TVA may not implement these Rate

Changes, or decide whether to impose them, without first completing an EIS.  Accordingly, by this action, Plaintiffs seek appropriate relief directing TVA to comply with NEPA in connection with its 2018 Anti-Solar Rate Changes.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

7.      Venue properly vests in this Court pursuant to 28 U.S.C. 1391(e)(1), which provides for venue over federal agencies, and 16 U.S.C. § 831g(a), which provides venue over TVA in this District.

## PARTIES

8.      Plaintiff Center for Biological Diversity ("the Center") is a national, non-profit conservation organization with offices throughout the United States, including in the Southeast. The Center has more than 1.5 million members and online activists who care about the country's urgent need to expedite its renewable energy transition and the protection of human health, the natural environment, and species from the ravages of climate change and other environmental harms.  The Center's Climate Law Institute fights against climate change by, *inter alia*, promoting the just and rapid transition to renewable energy resources, which includes challenging barriers deployed by utilities and utility regulators to stifle the advancement of rooftop solar and other clean energy sources.  As part of these efforts, the Center submitted extensive comments on TVA's 2018 Anti-Solar Rate Changes.

9.      The Center brings this action on its own institutional behalf and on behalf of its members, more than 4,500 of whom live in the states served by TVA.  This includes the Center's more than 200 members who live in Alabama.  Those Center members who live in TVA's

3

service territory are harmed by TVA's failure to comply with NEPA in imposing the Anti-Solar Rate Changes because these changes will both dis-incentivize investments in rooftop solar systems and reduce the benefits of energy efficiency or other measures that would reduce electricity generated from TVA's polluting energy sources.  Those polluting energy sources, in turn, release toxic pollutants and greenhouse gas emissions that endanger the environment and public health, thus further harming Center members and their ability to enjoy healthy air and a stable climate.

10.     Plaintiff Alabama Center for Sustainable Energy (*dba* Energy Alabama) is a statewide, non-profit organization advocating for the transition to sustainable energy in Alabama. Energy Alabama has more than 2,000 members and online activists who support sustainable energy in the State of Alabama for its beneficial economic, social, and environmental performance.  Energy Alabama works to accelerate the transition to sustainable energy through public education at all levels, advocacy for just energy policy, and the provision of technical assistance to those working to improve the energy performance of their homes and businesses. Energy Alabama members submitted comments on TVA's Grid Access Charge proposal and spoke directly to the TVA Board of Directors urging them to consider different mechanisms for rate recovery.

11.     Energy Alabama brings this action on its own institutional behalf and on behalf of its members, more than 50 of whom live in the Alabama territory served by TVA and are thus impacted by the Anti-Solar Rate Changes.  Energy Alabama members are harmed by TVA's failure to comply with NEPA in imposing the Rate Changes because they disproportionately affect both low-income customers and customers that use lower amounts of energy.  The Rate Changes also provide a direct financial disincentive to invest in energy efficiency.  Additionally,

4

the Rate Changes will increase the cost for affected Alabama residents to invest in rooftop solar systems.  In light of the resulting reductions in energy efficiency and renewable energy, TVA will increase its reliance on its existing fossil fuel generation, which creates more air pollution, including greenhouse gas emissions that threatens the environment, thus further harming Energy Alabama members.

12.     Plaintiff Friends of the Earth ("FoE") is a national non-profit environmental advocacy organization founded in 1969. FoE has offices in Berkeley, California and Washington, D.C, where it is incorporated. Its mission is to defend the environment and champion a healthy and just world. FoE's current campaigns focus on promoting clean energy and solutions to climate change, ensuring the food we eat and products we use are sustainable and safe for our health and the environment, defending tropical forests and the rights of forest-dwelling people, and protecting marine ecosystems and the people who live and work near them. FoE has more than 380,000 members in all fifty states and more than 3,000 living in the TVA service area.  Additionally, FoE has more than 1.5 million activists on its email list throughout the United States including thousands who reside in the TVA service area.  FoE has a history of working on issues relating to nuclear safety and energy access in the TVA service area.  Most recently, the organization has been working on the need to bolster efficiency and renewable energy resources in the TVA service area rather than continuing to use dirty and dangerous fossil fuel and nuclear power resources.  To that end, FoE submitted comments on the TVA's draft Environmental Assessment for its 2018 Rate Change in April.

13.     FoE brings this action on its own institutional behalf and on behalf of its members, more than 3,000 of whom live in the TVA service area. Those members are harmed by TVA's failure to comply with NEPA in imposing the Anti-Solar Rate Changes because these

changes will both dis-incentivize investments in rooftop solar systems, and reduce the benefits of energy efficiency or other measures that would reduce electricity generated from TVA's polluting energy sources. Those polluting energy sources, in turn, release toxic pollutants and greenhouse gas emissions that endanger the environment and public health, thus further harming FoE members and their ability to enjoy healthy air and a stable climate.

14. Plaintiff Gasp is an Alabama 501(c)(3) nonprofit organization headquartered in Birmingham, Alabama. Gasp seeks to improve the environment, economy and public health of Alabama. Presently, Gasp has more than 700 members in Alabama and more than 16,000 online activists who support the organization's mission to reduce air pollution through education and advocacy and its work to promote a just and rapid transition to clean, renewable energy. Gasp has more than 16,000 members and online activists who support the organization's mission to reduce air pollution through education and advocacy and its work to promote a just and rapid transition to clean, renewable energy.

15. Gasp brings this action on its own institutional behalf and on behalf of its members, dozens of whom live in areas served by TVA. Those Gasp members who live in TVA's service territory are adversely affected by TVA's failure to comply with NEPA in imposing the Anti-Solar Rate Changes because they disproportionately affect both low-income customers and customers that use lower amounts of energy. These changes will dis-incentivize investments in rooftop solar systems and reduce the benefits of energy efficiency or other measures that would reduce electricity generated from TVA's polluting energy sources. Those polluting energy sources, in turn, release toxic pollutants and greenhouse gas emissions that endanger the environment and public health, thus further harming Gasp members and their ability to enjoy healthy air and a stable climate

6

16.     Plaintiff Southern Alliance for Clean Energy ("SACE") is a non-profit organization that promotes responsible energy choices that work to address the impacts of global climate change and ensure clean, safe and healthy communities throughout the Southeast. After more than 30 years, SACE remains the only regional organization solely focused on transforming the way we produce and consume energy in the Southeast. SACE has more than 15,000 members and online activists in the states served by TVA who are concerned about reducing emissions that contribute to extreme weather from climate change; creating jobs and economic development in the clean energy sector; and reducing electric bills burden through effective efficiency programs.

17.     SACE brings this action on its own institutional behalf and on behalf of its more than 700 members and nearly 5,000 supporters who live in the Tennessee, and are impacted by the decision under review. SACE's members are concerned by the short public input timeline, the lack of transparency and TVA's failure to provide sufficient information to support its preferred alternative in the Draft 2018 Rate EA. SACE members are harmed by TVA's failure to comply with NEPA in imposing the Rate Change because they will be impacted by higher air and water pollution emissions caused by the rate change. Additionally, they will be less able to reduce their bills through solar energy or energy efficiency, contrary to the directive of the TVA Act to prioritize low-cost electricity for all customers. SACE submitted extensive comments on TVA's 2018 Rate Changes.

18.     Defendant Tennessee Valley Authority is a corporate agency and instrumentality of the United States, created by and existing pursuant to the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831, *et seq.* ("TVA Act").  The TVA Act provides that TVA "[m]ay sue or be sued in its corporate name," 16 U.S.C. §831c(j), and "shall be held to be an inhabitant and

7

resident of the northern judicial district of Alabama within the meaning of the laws of the United States relating to the venue of civil suits." *Id.* 831g(a).

## STATUTORY FRAMEWORK

### A. The National Environmental Policy Act

19.     NEPA and its implementing regulations require all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement, known as an Environmental Impact Statement ("EIS"), must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) the "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332.

20.     The Council on Environmental Quality—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, which are "binding on all federal agencies." 40 C.F.R. § 1500.3. These regulations require that, unless an activity is "categorically excluded" from NEPA compliance, an agency must either prepare an EIS, or, at the very least, an Environmental Assessment ("EA") which is used to determine whether an EIS is required. *Id.* § 1501.4.

21.     Among the factors an agency must consider to determine whether a project may have "significant" impacts, and therefore whether an EIS is required, are the "intensity" of the action. *Id.* § 1508.27. Among other relevant factors, the intensity of the impact must be judged based on:

(a)     the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration;

(b)     the degree to which the effects on the quality of the human environment are likely to be highly controversial [or are] highly uncertain;

(c)     whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and

(d)     whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.

*Id.* § 1508.27.

22.     Irrespective of whether an EIS is required, where an agency prepares an EA, the regulations require that the EA reasonably address, *inter alia*, the need for the proposed action and the reasonably foreseeable environmental impacts, in order to "provide sufficient evidence and analysis for determining whether to prepare" an EIS.  *Id.* § 1508.9.  This includes consideration of the cumulative impacts of the proposed action along with "other past, present, and reasonably foreseeable future actions."  *Id.* §1508.7.

23.     If, after preparing an EA, the agency concludes that an EIS is not necessary, it must issue a Finding of No Significant Impact ("FONSI") that adequately explains why the project will "not have a significant effect on the human environment," and an EIS will not be prepared.  *Id.* § 1508.13.

**B.     The TVA Act**

24.     Congress created TVA in 1933, directing the agency to, *inter alia*, promote "the economic, environmental, social, or physical well-being of the people of the service area" through its electricity rate-making.  16 U.S.C. § 831a(g)(1)(K)(ii).  More specifically, the original TVA Act mandates that TVA must be managed "for the benefit of the people . . . as a whole and particularly the domestic and rural consumers to whom the power can be

economically made available, and accordingly that sale to and use by industry shall be a secondary purpose, to be utilized principally to . . . permit domestic and rural use at the lowest possible rates . . . ."  *Id.* § 831(j).

25.     In 1992, Congress added a "least-cost planning program" to TVA's mandates, requiring that TVA engage in a "planning and selection process for new energy resources which evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources) in order to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost."  16 U.S.C. § 831m-1(b)(1).  Congress further directed that this planning and selection process, among other things, must "take into account the ability to verify energy savings achieved through energy conservation and efficiency," *id.* § 831m-1(b)(2)(ii), and also that the "lowest system cost" include, *inter alia*, "all direct and quantifiable net costs for an energy resource over its available life, including the cost of production, transportation, [and] utilization . . . ."  *Id.* at § (b)(3).

26.     Finally, in 2004, Congress once again amended the TVA Act, expressly providing that TVA's mission includes "being a national leader in technological innovation, low-cost power, and environmental stewardship."  16 U.S.C. § 831a(b)(5).  Thus, TVA recognizes that the agency's mission explicitly includes "[c]aring for the region's natural resources."

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

### A.     TVA's Generation Of Electricity And Revenue Sources

27.     TVA is the nation's largest public power provider.  It generates electricity for most of Tennessee, northern Alabama, northeastern Mississippi, southwestern Kentucky, and portions of northern Georgia, western North Carolina, and southwestern Virginia.

28.     In 2017, nearly 50% of TVA's electricity was generated from dirty fossil fuels. Specifically, approximately 25% of TVA's electricity was generated from eight TVA-owned coal-fired power plants.  In that year alone, these plants burned more than 42 billion pounds of coal.  Another 25% of TVA's electricity came from other fossil fuel sources.

29.     TVA serves approximately 9.7 million people with electricity, largely through wholesale electricity sales to Local Power Companies ("LPCs"), who resell the power to retail customers.  These LPCs are municipalities and other local government entities, as well as customer-owned entities.

30.     TVA has wholesale power contracts with approximately 154 LPCs.  These wholesale power contracts specify the resale rates and charges at which the LPC must resell TVA power to its customers.  The two largest LPCs with whom TVA holds contracts—Memphis Light, Gas and Water Division and Nashville Electric Service—accounted for 10% and 9%, respectively, of TVA's total operating revenues in 2017.

31.     In addition to selling wholesale electricity to LPCs, TVA also directly sells electricity to certain end-use customers—approximately 50 large commercial and industrial consumers and federal agencies with electricity loads larger than 5,000 kilowatts.

32.     TVA generates nearly all of its revenue from electricity sales.

33.     In TVA's service territory, households in the lowest income category pay more than 15% of their annual income on electricity – and in some counties over 20%  – leading these communities to carry some of the highest energy burdens (the proportion of electricity costs to total income) in the country.  Thus, according to TVA itself, these communities are "the most vulnerable to increases in electricity prices."

**B.    Distributed Energy Resources In TVA's Territory And TVA's Resource Planning Process**

34.    In recent years, a small number of TVA customers—much like electricity customers around the country—have invested in distributed energy resources ("DER"), which include rooftop solar generation, energy efficiency measures, and energy storage.  Distributed Generation ("DG") systems like rooftop solar panels generate pollution-free solar electricity, which customers use in their own homes and businesses, and which offsets electricity bills in a manner analogous to energy efficiency measures that similarly reduce customer reliance on TVA's dirty electricity.

35.    In states within TVA's service territory, less than 0.4% of electricity is generated from DG; in some of the states TVA serves, this percentage is much lower.  This proportion of DG penetration is far less than the national average, which is almost 400% higher, and that of high DG-penetration states such as California and Hawaii, which generate over 9% and 22%, respectively, from DG.

36.    TVA addresses DG and its integration into the grid through a "dual-meter" system, whereby one meter tracks the TVA-generated electricity going into the home or facility, while another tracks the power generated from the renewable energy system going into the grid. For more than 10 years, TVA's DG Rate – the rate paid for electricity generated from DG – has been 10 cents/kWh.

37.    While TVA has implemented several programs like dual-metering to address DG development, TVA has never before expressly relied on its rate structure or general resource planning process to address the addition of DG to the energy mix in TVA's territory.

38.     In particular, in 2015, TVA prepared its most recent Integrated Resource Plan ("IRP") to "address the demand for power in the TVA service area, the resource options available for meeting that demand, and the potential environmental, economic, and operating impacts of these options."  Although the 2015 IRP, which was the subject of a separate EIS, discussed ways in which TVA itself might invest in solar and other renewable resources, it entirely failed to consider the environmental impacts associated with its customers' increased adoption of DER, characterizing that issue as "outside the scope of the IRP."   Thus, none of the IRP alternatives directly addressed expanded DER development in TVA's service territory.

39.     In February, 2018 TVA announced it is updating the IRP, and requested initial comments on the IRP's scope.  83 Fed. Reg. 6,668 (Feb. 14, 2018).  TVA explained the 2015 IRP is being updated "in response to major changes in the electrical utility industry," particularly "advances in the development of distributed energy resources," and will assess the impacts of "alternative portfolios of energy resource options" in light of the fact that "consumer demand for renewable and distributed energy resources . . . is growing."  *Id.* (emphasis added). Thus, the new IRP—which has not yet been prepared—will address, *inter alia*, "the availability and use of" DER, the "effects of power production on the environment, including climate change," "emissions of greenhouse gases" and "air quality," and "how [DER should] be considered in TVA planning."  *Id.*

40.     In late July, 2018, TVA issued a "Scoping Report" summarizing comments on the new IRP, and outlining the scenarios that will be considered in the upcoming IRP process. These scenarios include one in which "DER is incentivized to achieve high-end of long-term penetration goals," and another that includes incentivizing "renewables at all scales to meet growing prospective or existing customer demands for renewable energy."

13

41.     TVA expects the new IRP and accompanying EIS—which apparently will, for the first time, seek to address the role of DER in TVA's power-supply mix—to be completed sometime in 2019.

### C.     TVA's 2018 Anti-Solar Rate Change Proposal And Draft Environmental Assessment

42.      TVA maintains that DER constitutes "competition in the form of emerging technologies," and has explained, in a filing with the Securities and Exchange Commission, that it views customer adoption of DER as "operational risks" that it must address, because "TVA effectively loses revenue on energy that DER send[s] to the grid."

43.     To address these concerns, in the summer of 2017 TVA informed its LPCs that it was working to develop a new rate structure that would, *inter alia*, (a) reduce rates for large commercial customers; (b) for the first time impose a new GAC; and (c) reduce rates for those using the most electricity.  Subsequently, in March, 2018, the agency issued a Draft Environmental Assessment ("Draft EA") concerning these proposed Anti-Solar Rate Changes.

44.     The Draft EA purported to consider the environmental impacts associated with TVA's proposal to decrease electricity rates for certain large commercial customers.  As TVA explained, unless these electricity rates for large corporations are reduced, those large customers will have "increased incentives to pursue uneconomic DER."  Put another way, as TVA explained elsewhere, TVA "wants to reduce wholesale energy prices" to purposefully remove "DER incentives" and obstruct DER adoption by larger corporations. In order to recoup the at least $23 million revenue loss from large commercial customers, TVA explained it would increase energy rates for other customers.

45.     Separately, the Draft EA purported to consider the environmental impacts of the new Grid Access Charge ("GAC").  Under that rate change, TVA proposed to reduce the existing wholesale standard service charge for electricity by a certain amount, ranging from 0.25 cents per kWh to 2.5 cents per kWh. TVA's preferred alternative in the Draft EA was to reduce the service charge by 1 cent per kWh, which, as TVA explained, would reduce "seasonal wholesale standard service energy charges by $1.2 billion."

46.     To recoup this $1.2 billion dollars, the Draft EA purported to consider the impacts of TVA, for the first time, imposing a GAC on all LPCs.  TVA explained that it expected the fixed fees in the GAC to be passed on to the LPCs' retail customers, who would be required to pay a fixed fee regardless of the amount of electricity they used.

47.     Finally, the Draft EA considered lowering rates for customers who use the most electricity by decreasing electricity rates for those customers using more than approximately 1,000 kWh per billing period.

48.     Attempting to justify these Anti-Solar Rate Changes, in the Draft EA TVA raised concerns about the impact of high levels of DER penetration on utilities by heavily relying on a manual issued by the National Association of Regulatory Utility Commissioners ("NARUC Manual").  However, TVA failed to mention that the NARUC Manual explicitly warns against manipulating customer electricity rates in order to address DER adoption in jurisdictions, like TVA's service territory, where there is "currently low DER adoption levels and with current policies not designed to spur DER growth."  As the NARUC Manual acknowledges, rate changes that are "not well thought out could set policies and implement rate design mechanisms that have unintended consequences such as potentially discouraging customers from investing in DER."

49.     If TVA's Anti-Solar Rate Changes fulfill their intended purpose to reduce DER deployment that would otherwise occur in TVA's service territory, TVA will continue generating more central power electricity than it would have under the *status quo*—where there would be more DER development, and thus less demand for fossil fuel electricity.  This result, in turn, will have concrete public health and environmental impacts due to the toxic air and greenhouse gas pollution from TVA's fossil fuel power plants.

50.     However, in the Draft EA, TVA stated that "there would generally be no variation in impacts to the environment among alternatives."  In particular, because, as TVA asserted, "none of the alternative rate changes is substantive enough to result in market responses and customer behavior changes," the agency concluded that "there would be no discernible impacts to air resources, water resources, land use, or waste production" from any of the alternatives considered.

**D.     Plaintiffs' Comments On The Draft EA**

51.     TVA provided only thirty days to comment on the Draft EA, rejecting public requests for an extension of the comment period and for public hearings.

52.     Nonetheless, numerous comments were submitted opposing the Anti-Solar Rate Changes, including from Plaintiffs.  For example, in their comments, the Center for Biological Diversity explained that, contrary to TVA's predictions, substantial research demonstrates that customers considering investing in DG are highly sensitive to changes in retail rate structures that make DG less attractive.  The Center also explained that TVA's Anti-Solar Rate Changes are entirely unnecessary because, as other research demonstrates, given the extremely low levels of DG in TVA's service territory, the impacts of DG on overall electricity prices will remain negligible for many years.  The Center also explained that, contrary to TVA's claim that DG is

16

"uneconomic," in fact it adds value by, *inter alia*, avoiding greenhouse gas emissions and water use, increasing grid resilience, and providing economic development and jobs creation.

53.    The Center also explained that the Draft EA failed to properly consider the environmental impact of the Anti-Solar Rate Changes, and that an EIS is necessary in light of both those impacts and the fact that these changes, *inter alia*, (a) establish a new precedent with significant effects; (b) are highly controversial, and (c) threaten to violate the TVA's statutory mandate to support environmental stewardship and prioritize residential over commercial customers.

54.    As another example, in their comments, Plaintiff the Southern Alliance for Clean Energy ("SACE") explained that TVA's proposal to favor industrial customers over residential customers is particularly inappropriate given that over 40% of households in TVA's service territory are low income consumers who can least afford the increased bills TVA is imposing in order to further subsidize industrial customers.  SACE also explained that the substantial negative effects of the Anti-Solar Rate Changes, on both DER adoption and energy efficiency, will inevitably lead TVA to rely more heavily on fossil fuel generation, with negative environmental impacts.

55.    As one further example, in their comments, the Tennessee Department of Environment and Conservation ("TDEC") expressed concerns that, by charging customers less when they use more energy, the Anti-Solar Rate Changes will "penalize those who have made weatherization and/or energy efficiency improvements."  TDEC also raised concerns regarding the "demographic composition and economic status of the population expected to experience a rate increase."

56.     TDEC also discussed the value of DER for companies, and raised concerns that "[b]y reducing energy rates and increasing fixed fees, the economics of microgrids and reliability projects become more burdensome for mission-critical customers."  TDEC also urged TVA to "monetize impacts of pollution associated with different fuel types" used by TVA, explaining that taking that into account "may shift how DER are valued under the TVA rate structure."

57.      Like other commenters, TDEC also raised concerns about whether TVA had adequately addressed the "changes in TVA power generation and any resulting ambient air pollution or GHG levels" from the Anti-Solar Rate Changes, recommending that "TVA consider the full picture of DER, energy efficiency, and potential energy usage rates when assessing potential GHG emissions" and other impacts of the proposal.  TDEC further explained that TVA should "further study and report on the impact of GHG emissions from increased DER," explaining that "[b]y reducing energy rates to dis-incentivize DER, TVA will limit or inhibit GHG-reducing projects including solar, CHP, and wind."  As TDEC also noted, "[i]ncreasing interest in on-site generation coupled with rapidly declining costs for these projects could mean that a greater number of projects could be completed if TVA" kept its current rate structure, "thereby reducing GHG emissions in the Valley."

**E.     TVA's Final EA On The Anti-Solar Rate Changes**

58.     Despite these comments and concerns, in early May 2018 TVA finalized its EA and issued an accompanying Finding of No Significant Impact ("FONSI") concluding that an EIS is not necessary.  TVA explained that it was imposing the Anti-Solar Rate Changes because "the current pricing structure over-incentivize[s] consumer installation of distributed energy resources (DER) . . . ."   According to TVA, since it is faced with "flat or even declining" need for power, and thus "little need for new energy sources," the Anti-Solar Rate Changes are needed

to address the "imbalance created by uneconomic DER development."  In short, TVA explained that addressing future DER development "is a primary reason why TVA has proposed a rate change."

59.     The Final EA also emphasized TVA's "immediate concern" with leading "commercial customers" who are "taking on sustainability goals and committing to purchase up to 100% of their energy resources from renewable resources."  Without the Anti-Solar Rate Changes, TVA explained, these customers will continue to have "increased incentives to pursue uneconomic DER."

60.     To address these purported concerns, in the Final EA, TVA first proposed to "lower energy rates for large general service customers" by at least $23 million.  By lowering rates, TVA can reduce those customers' economic interest in investing in renewable energy, since they will achieve less savings from that transition than would occur under the current rate structure.  To "maintain TVA revenue neutrality," TVA will increase rates on other customers to make up the savings to the large general service customers.

61.     Second, the Final EA recommended that TVA reduce the wholesale standard service energy rate by 0.5 cent/kWh, and recoup that lost revenue through the GAC.  Since the Draft EA stated that a 1 cent per kWh reduction in rates would have shifted $1.2 billion in revenue to the GAC, this revised final proposal of a 0.5 cent/kWh reduction in wholesale rates should shift approximately $600 million in revenue from volumetric charges, under which customers' electricity rates are based on their electricity usage, to fixed charges, under which a portion of customers' electricity rates are set regardless of electricity use.

62.     Importantly, TVA asserted that it will "design default retail rate structures and rate levels for each LPC" that will pass along the new fixed charges to retail customers. However, although the Final EA also claimed that those default rates will limit the increase that residential customers will pay per month as a result of these changes, TVA did not explain at all how this will be accomplished.

63.     Third, in the Final EA, TVA proposed to lower rates for customers who use the most electricity.  Under the default rates, TVA anticipates customers consuming up to 1,000 kWh per month will see rate increases, and increases in their monthly bills of up to approximately 2%.  At the same time, TVA anticipates that customers who use more than 1,000 kWh per month will see a rate decrease and, for the very largest energy consumers, a decrease in their monthly bills of more than 3%.   The Final EA included a chart showing how those who use less energy will pay more, while those using more energy will pay less, reproduced below.



64.    Overall, these Anti-Solar Rate Changes will not only reduce customer investment in DG, but will also concretely reduce incentives for energy efficiency or other measures that will lessen electricity usage, as customers will be perversely paying less for using more electricity.  TVA recognized that "price can be an important driver that explains changes in demand" and asserted that under the proposed alternative, "the penetration of DER may be slowed marginally."  TVA also stated the Anti-Solar Rate Changes would have "positive effects" on large commercial customers while having "negative effects" on residential and other standard service customers.

65.    Despite these statements, TVA failed to analyze the corresponding impacts of the Rate Changes on the environment.  Rather, the Final EA, like the Draft EA, concluded that "none

of the alternative rate changes is substantial enough to result in market responses and customer behavior changes that would require TVA to modify its power generation operations."  Thus, contrary to the entire premise of the Anti-Solar Rate Changes—which is to discourage DER—for purposes of evaluating environmental impacts, TVA claimed that the revised rate structure will "not discourage energy efficiency or investment in DER."  Indeed, in the Draft EA, TVA concluded that a GAC of 2.5 cents/per kWh—*five times* the amount of the GAC to be imposed— would still be "unlikely to influence the rate of investment in DER among TVA consumers."

66.     Based on that premise, in the Final EA, TVA maintained that the Anti-Solar Rate Changes will have "no discernible impacts to air resources, water resources, land use" or other environmental impacts.  As a result, TVA provided no analysis or prediction as to the anticipated reduced load on central TVA power from DER and energy efficiency initiatives under either the no-action scenario or the alternatives, and thus no basis on which to compare the relative environmental impacts of the alternatives considered.

67.     In the Final EA, TVA also concluded that there would be no environmental benefits from the no-action alternative—*i.e.*, that the additional DG from homeowners and commercial companies that the Anti-Solar Rate Changes are expressly designed to discourage would not reduce the amount of energy TVA generates through coal, gas and other sources. Rather, claiming that such changes "remain speculative," TVA entirely ignored the concrete environmental benefits from transitioning to DER, including solar technologies, as compared to central TVA power.

68.     In the FONSI accompanying the Final EA, TVA once again reiterated its conclusion that the agency's "current energy prices over-incentivize consumer installation of

DER," and that the Anti-Solar Rate Changes are therefore necessary to "mitigate[e] the effects of uneconomic development in distributed energy resources (DER)."

69.     In choosing the alternative of a 0.5 cent/kWh GAC, TVA explained that this option will "allow for a gradual transition and provide TVA an opportunity to make appropriate adjustments in future rate corrections if necessary" —*i.e.*, if the initial GAC does not produce the desired reductions in DER development.

70.     According to the FONSI, TVA expects that under the chosen GAC, "the penetration of DER may be slowed marginally."  In the FONSI, TVA also determined that high-energy usage households will save money from these changes, while low-energy usage households will see increased energy bills.

71.     As in the Final EA, in the FONSI TVA also concluded that "none of the alternative rate changes is substantive enough to result in market responses and customer behavior changes that would require TVA to modify its power generation operations."

72.     Based on that premise, the FONSI concluded that the Anti-Solar Rate Changes will have no discernible environmental impacts, and that "an environmental impact statement is not required."

**F.     The Reduction In The DG Rate, And The TVA Board's Approval Of The Anti-Solar Rate Changes**

73.     On April 18, 2018, TVA, for the first time, reduced the compensation paid for the electricity generated by DER.  Although, for more than ten years, TVA has paid 10 cents/kWh for the electricity generated by homeowners who install DER systems, as of this year TVA has lowered that rate to 9 cents/kWh, further reducing the value of investing in DER.  The Final EA does not mention this contemporaneous rate change, or address the synergistic effect of this rate change with the Anti-Solar Rate Changes discussed in the EA.

23

74.     At its May 10, 2018 meeting, the TVA Board considered a Proposed Board Resolution approving the Anti-Solar Rate Changes considered in the EA.  Spokespeople for numerous groups gave oral testimony against the proposed changes, including the Tennessee Small Business Alliance, the NAACP, and several Plaintiffs.

75.     Despite these myriad public concerns, the Anti-Solar Rate changes addressed in the EA were initially approved by the Board on a voice vote.

76.     On August 23, 2018, the TVA Board held its most recent meeting, during which the Minutes of the May 10, 2018 meeting were approved.  On information and belief, the Board's approval of the Minutes rendered the Anti-Solar Rate Changes approved at the May meeting a final decision by TVA.

## PLAINTIFFS' CLAIM FOR RELIEF

77.     By completing an EA that does not meaningfully address the environmental impacts of TVA's Anti-Solar Rate Changes, and by issuing a FONSI and approving the Anti-Solar Rate Changes based on that EA, TVA is violating NEPA and its implementing regulations, and is acting in a manner that is arbitrary and capricious and contrary to law in violation of the APA.  5 U.S.C. § 706.

78.     By failing to consider the EA's Anti-Solar Rate Changes along with the reduction in the DG Rate, TVA is unlawfully segmenting the environmental impacts of its actions in violation of NEPA and its implementing regulations, and is acting in a manner that is arbitrary and capricious and contrary to law in violation of the APA.  5 U.S.C. § 706.

79.     By failing to prepare an EIS on the Anti-Solar Rate Changes, which, *inter alia*, (a) "may establish a precedent for future action with significant effects"; (b) will have "highly controversial" and "highly uncertain" effects;  (c) is related to other actions with cumulatively

24

significant impacts; and/or (d) "threatens a violation" of the TVA Act, 40 C.F.R. § 1508.27, TVA is violating NEPA and its implementing regulations, and is acting in a manner that is arbitrary and capricious and contrary to law in violation of the APA.  5 U.S.C. § 706.

80.    By making a final decision on the Anti-Solar Rate Changes before completing its 2019 IRP, in which TVA will, for the first time, address, *inter alia*, "the availability and use of" DER, the "effects of power production on the environment, including climate change," "emissions of greenhouse gases" and "air quality," and "how [DER should] be considered in TVA planning," TVA is violating NEPA and its implementing regulations, and is acting in a manner that is arbitrary and capricious and contrary to law in violation of the APA.  5 U.S.C. § 706.

81.    These violations are injuring Plaintiffs in the manner described in Paragraphs 8-17 above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    declare that TVA has violated NEPA and the APA;

2.    set aside and remand the TVA's FONSI and the 2018 Anti-Solar Rate Changes;

3.    vacate TVA's decision to impose the 2018 Anti-Solar Rate Changes, and direct that TVA comply with NEPA by preparing an EIS before implementing any component of the Anti-Solar Rate Changes;

4.    retain jurisdiction of this matter until TVA has come into compliance with NEPA and the APA;

5.    award Plaintiffs their costs, attorneys' fees, and other disbursements for this action, including any expert witness fees; and

6.      grant Plaintiffs such other and further relief as the Court may deem just and proper.


DATED: September 6, 2018                    Respectfully submitted,

                                            */s/ R. David McDowell*
                                            R. David McDowell
                                            State Bar No. MCD023
                                            Law Office of R. David McDowell
                                            121 Jefferson Street N
                                            Huntsville, AL 35801
                                            256-564-7474
                                            Fax (256) 564-7473
                                            RDavidMcDowell@gmail.com

                                            */s/ Howard M. Crystal*
                                            HOWARD M. CRYSTAL (DC Bar No. 446189)
                                            *Pro hac vice applicant*

                                            */s/ Anchun Jean Su*
                                            ANCHUN JEAN SU (DC Bar No. CA285167)
                                            *Pro hac vice applicant*

                                            CENTER FOR BIOLOGICAL DIVERSITY
                                            1411 K Street N.W., Suite 1300
                                            Washington, D.C. 20005
                                            Telephone:     (202) 849-8399
                                            Email:         hcrystal@biologicaldiversity.org
                                                           jsu@biologicaldiversity.org

                                            *Counsel for Plaintiffs*