IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

CENTER FOR BIOLOGICAL
DIVERSITY, ALABAMA CENTER
FOR SUSTAINABLE ENERGY d/b/a
ENERGY ALABAMA, FRIENDS OF
THE EARTH, GASP, and SOUTHERN
ALLIANCE FOR CLEAN ENERGY,
Plaintiffs,

v.                                              No. 3:18-cv-01446-LCB

TENNESSEE VALLEY AUTHORITY,
Defendant.

---

**BRIEF IN SUPPORT OF TVA'S MOTION TO DISMISS UNDER
FEDERAL RULES OF CIVIL PROCEDURE
12(b)(1) AND 12(b)(6)**

---

David D. Ayliffe
Associate General Counsel
Frances Regina Koho, Attorney
Steven C. Chin, Attorney
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.2410
frkoho@tva.gov

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................1

BACKGROUND .................................................................................3

    I.    TVA's Statutory Mission and Rate-Setting Authority.........................3

    II.   The Changing Utility Industry and TVA's Recent Rate Changes. .......5

ARGUMENT .....................................................................................10

    I.    Plaintiffs Lack Constitutional Standing to Pursue Their NEPA
        Claim Against TVA...............................................................10

        A.    Plaintiffs cannot show injury-in-fact. ......................................11

        B.    Plaintiffs' injuries cannot fairly be traced to TVA's
              reasonable decision in 2018 to adjust rates..............................13

        C.    Plaintiffs cannot establish redressability.................................17

    II.   Even If Plaintiffs Could Establish Article III Standing, They
        Lack Prudential Standing Because They Assert Generalized
        Grievances Best Suited to Resolution by Other Branches of
        Government. ........................................................................19

    III.  Because Plaintiffs' Alleged Injuries Implicate Economic
        Concerns, They Are Not Within NEPA's "Zone of Interests" and
        Their Complaint Should Be Dismissed for Failure to State a
        Claim. ................................................................................23

CONCLUSION ...................................................................................25

# INTRODUCTION

This case is, in essence, a backdoor attempt to challenge the TVA Board of Directors' exclusive statutory authority to set rates, terms, and conditions for the sale of electric power produced by TVA. The Center for Biological Diversity; Alabama Center for Sustainable Energy; Friends of the Earth; GASP; and Southern Alliance for Clean Energy ("Plaintiffs") are five non-profit organizations promoting various conservation and/or environmental efforts. They allege that TVA violated the National Environmental Policy Act, 42 U.S.C. § 4321, et seq. ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. § 501 et seq. ("APA"), when TVA implemented an incremental rate change in 2018 that was designed to adjust rates for certain customers to accurately reflect the actual costs incurred by TVA to serve them and to more equitably recover the costs associated with operating a power and transmission system that serves over nine million people. Plaintiffs mischaracterize these changes as "anti-solar" in nature and contend, without support, that they will discourage customers from being energy efficient and relying on renewable sources of energy.

The crux of Plaintiffs' Complaint is a butterfly effect argument—that TVA's incremental rate change dis-incentivizes adoption of solar power, which will increase use of "dirty electricity," which will contribute to emissions of greenhouse gas and toxic pollutants, which will then harm their enjoyment of air quality and a

stable climate. However, their Complaint is unsupported by allegations sufficient to tie these asserted environmental injuries to TVA's rate change, as opposed to the independent actions of millions of other industries, entities, and people that may contribute to climate change in the Tennessee Valley region and beyond. Plaintiffs' speculative chain-of-causation theory is simply too tenuous to support standing under Article III of the U.S. Constitution.  Moreover, the Complaint requests that this Court wade into complex policy issues that are committed to the sound discretion of TVA and are best suited for resolution by the political branches. Thus, Plaintiffs' Complaint should be dismissed for lack of constitutional and prudential standing under Federal Rule of Civil Procedure 12(b)(1).

Furthermore, because Plaintiffs are challenging TVA's actions under NEPA pursuant to the APA,[1] they must also demonstrate that any alleged injury is within the "zone of interests" protected by NEPA. Because Plaintiffs' allegations invoke mainly economic concerns that are tenuously connected, if at all, to any environmental injuries, those injuries are outside NEPA's "zone of interests." Allowing these claims to proceed would provide Plaintiffs with the ability to use NEPA as a stick to attack TVA's business judgment in rate-setting, which is

---

[1]     Because NEPA does not have its own private right of action, NEPA suits are brought under the APA. *See, e.g.*, *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (noting that the APA "provides for judicial review of federal agency actions and allows federal courts to enjoin authorities of the United States government").

statutorily committed to the agency's sound discretion. This would contravene NEPA's intended purpose and, therefore, warrants dismissal of Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

### I.    TVA's Statutory Mission and Rate-Setting Authority.

TVA is a constitutionally authorized executive branch corporate agency and instrumentality of the United States created by and existing pursuant to the TVA Act of 1933, 16 U.S.C. §§ 831 et seq. ("TVA Act"). TVA is responsible for the multi-purpose development of the Tennessee Valley region's resources and economy. *See* 16 U.S.C. § 831.[2] One of TVA's statutory objectives is to provide adequate, affordable, and reliable electricity to the more than nine million people in TVA's seven-state service area. *See* 16 U.S.C. § 831j; *id.* §§ 831n-4(f) & (h); *id.* § 831d(*l*).

To achieve this objective, TVA maintains and operates the nation's largest public power system (*see* Ex. 1, 2018 Wholesale Rate Change, Final Environmental Assessment at 47 [hereinafter referred to as "Final EA"]),[3] which

---

[2]    TVA is governed by a nine-member Board of Directors, who are appointed by the President with the advice and consent of the Senate. 16 U.S.C. § 831a(*a*)(1). The TVA Board has a statutory duty to "establish the broad goals, objectives, and policies of the Corporation that are appropriate to carry out this chapter." *Id.* § 831a(*g*)(1)(A).

[3]    TVA requests that this Court take judicial notice of TVA's Final EA (Ex. 1), the accompanying Finding of No Significant Impact ("FONSI") (Ex. 2), and TVA's publicly

generates electricity using a diverse power portfolio. *See* TVA, Our Power System,

*available at* https://www.tva.gov/Energy/Our-Power-System.**4** TVA sells this

electricity to 154 municipal and cooperative local power companies ("LPCs"),

which then distribute it to residential, commercial, industrial, and governmental

customers. (Ex. 1, Final EA at 6-7.) TVA also sells its electricity directly to

industrial customers with large or unusual loads and to several federal agency

installations. (*Id.*)

Congress vested the TVA Board with exclusive authority to set rates for the

sale of TVA electricity. *See* 16 U.S.C. § 831a(*g*)(1)(L); *Mobil Oil Corp.*, 387

---

(. . . continued)

available websites under Federal Rule of Evidence 201. Initially, these items are subject to judicial notice because they are generally matters of public record. *See, e.g., Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) ("A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment. Public records are among the permissible facts that a district court may consider." (citations omitted)). Moreover, courts in this circuit have taken judicial notice of public documents issued by TVA, as well as those issued by other federal and state agencies. *See Mobil Oil Corp. v. TVA*, 387 F. Supp. 498, 516, n.41 (N.D. Ala. 1974) (taking judicial notice of TVA annual reports); *see also Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) (taking judicial notice of reports prepared by Florida Department of Corrections); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) (taking judicial notice of agency records and reports). The same is true for government websites. *See, e.g., Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, No. 16-21296-CIV, 2017 WL 3503371, at *7 (S.D. Fla. Aug. 15, 2017) (taking judicial notice of information publically available on an official government website and listing cases holding the same); *accord Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003); *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 (1st Cir. 2010). Moreover, the Final EA and FONSI are referenced extensively in Plaintiffs' Complaint (*see* ¶¶ 58-78). *See Financial Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284-85 (11th Cir. 2007) (observing that documents referenced by plaintiff in complaint that are central to claim may be considered if contents are not in dispute and defendant attaches document to motion).

**4**      TVA's "emphasis has moved away from traditional coal-based production and toward cleaner forms of power generation, and today the power [TVA] deliver[s] is 54 percent carbon-free." *Id.*

F. Supp. at 506 ("The fixing of rates which will balance and achieve all of [TVA's]
different objectives is a matter which Congress has entrusted to the judgment of the
TVA Board, and . . . is not subject to judicial review.").[5] In setting rates, the Board
must have "due regard for . . . the objective that power shall be sold at rates as low
as are feasible," 16 U.S.C. § 831n-4(f), but it must also ensure that this obligation
is balanced with (among others) its responsibility to earn sufficient income to
remain financially sound. *See id.*[6] TVA exercises this rate-setting authority
primarily through the agreements it enters into with the distributors of the power
TVA produces and with the customers it serves directly. *See* 16 U.S.C. § 831i
(authorizing TVA "to include in any contract for the sale of power such terms and
conditions, including resale rate schedules, . . . as in its judgment may be necessary
or desirable for carrying out the purposes of this chapter").

## II.    The Changing Utility Industry and TVA's Recent Rate Changes.

Producers of electricity, like TVA, have two main costs: fixed and variable.

Fixed costs include the infrastructure needed to generate and transmit power; the

---

[5]     A long line of precedent, starting with this Court's ruling in *Mobil Oil Corp. v. TVA*,
establishes that TVA's rate-related decisions are not subject to judicial review. *See, e.g.*,
*McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 405 (6th Cir. 2006); *4-County
Elec. Power Ass'n v. TVA*, 930 F. Supp. 1132, 1138 (S.D. Miss. 1996); *Carborundum Co. v.
TVA*, 521 F. Supp. 590, 593 (E.D. Tenn. 1981); *Consol. Aluminum Corp. v. TVA*, 462 F. Supp.
464, 474 (M.D. Tenn. 1978).

[6]     TVA does not receive federal appropriations, and thus its power programs are self-
financed.  (*See* Ex. 1, Final EA at 6.)

equipment the utility must use every day to service the power system; and the personnel involved in the production of electricity. Variable costs include fuel sources used to generate power. *See* TVA's Proposed 2018 Rate Restructure, Your Local Power Company and You, *available at* http://www.tvarates.com/.

For many decades, utilities across the country (including TVA) charged their customers based almost exclusively on the volume of electricity they consumed, which was generally sufficient to cover the utilities' variable and fixed costs. Today, recent advances in technologies, like energy-efficient appliances and home-based solar power, have decreased customer energy consumption, but the utilities' fixed costs required to maintain a reliable and resilient power grid for customers remain the same. *See id.*; *see also Rate Restructuring: Why Now?*, *available at* http://www.tvarates.com/.

As a result, TVA began evaluating its own rate structure to address this industry shift. In 2015, TVA began discussions with the Tennessee Valley Public Power Association ("TVPPA") and the Tennessee Valley Industrial Committee ("TVIC")[7] about ways TVA could make incremental changes to improve pricing

---

[7]    TVPPA is a nonprofit organization that represents the interests of consumer-owned electric utilities operating within TVA's service area. *See* TVA, Public Power for the Valley, *available at* https://www.tva.gov/Energy/Public-Power-Partnerships. TVIC is an organization representing 41 of the most electricity-intensive directly served customers. These companies employ more than 30,000 people in the Tennessee Valley, predominantly in high-wage and salaried positions. *Id.*

signals (i.e., the information relayed to consumers via the rates charged for energy) and fixed cost recovery. (Ex. 2, FONSI at 1.) The 2015 rate change that resulted from these discussions was TVA's first step towards better aligning pricing with underlying cost drivers. (*See* Ex. 1, App. A to Final EA, Aug. 9, 2017 Letter from TVA to LPCs [hereinafter "Aug. 9 Letter"].)

The 2018 rate change that is the subject of this litigation represents another incremental step in TVA's attempt to refine its rate structure to better align its wholesale rates with underlying costs. (Ex. 2, FONSI at 1.) After continued discussions with its LPCs and directly served customers (Ex. 1, Final EA, Executive Summary at i), TVA issued a rate change letter to its LPCs in August 2017 proposing the implementation of the instant rate change. (*See* Ex. 1, Aug. 9 Letter, Final EA at 75.) The most fundamental change under consideration was implementation of a grid access charge, which would be a fixed charge that customers would pay regardless of monthly energy usage. (*See id.* at 76.)

TVA then made the discretionary decision to study this proposed change under NEPA[8] to allow for broader public participation. TVA prepared an

---

[8] *See* 42 U.S.C. §§ 4321 et seq. NEPA is designed to ensure that "agency attention will be focused on the probable environmental consequences of the [agency's] proposed action," *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1540 (11th Cir. 1990), but it is not "a substantive environmental statute which dictates a particular outcome if certain consequences exist." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1214 (11th Cir. 2002) (citations omitted).

Environmental Assessment ("EA"), which was issued in draft form in March 2018.[9] TVA received 1,741 comment submissions from the public and other stakeholders, which TVA responded to and used to make certain changes to the EA. (*See generally* Ex. 1, App. D to Final EA, Public Comments on the Draft EA & TVA Responses.)

In May 2018, TVA released its Final EA, in which TVA considered five alternatives. TVA's preferred alternative was "Alternative C1." In pertinent part, this alternative reduced the wholesale Standard Service energy rate[10] by a half-penny per kilowatt hour and added a corresponding grid access charge. The purpose of the grid access charge was to ensure that all customers, including users of distributed energy resources ("DER"), like rooftop solar panels, who also utilize the grid, contributed to the maintenance of TVA's infrastructure. Alternative C1 also lowered energy rates for large commercial customers by approximately eight

---

[9]    NEPA requires a federal agency to prepare the most intensive study, an Environmental Impact Statement ("EIS"), only when a major federal action is expected to "significantly" affect the quality of the human environment. 42 U.S.C. § 4332(C). An agency may prepare an EA for a proposed action in order to determine whether or not an EIS is needed. 40 C.F.R. §§ 1508.9, 1501.3, 1501.4(b) & (c). If, based on the EA, the agency determines that the impacts of the proposed action will not significantly affect the environment, then it issues a FONSI and an EIS is not required. 40 C.F.R. § 1501.4(c) & (e); 40 C.F.R. § 1508.13; *see generally Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756-58 (2004). "[T]he decision not to prepare an EIS is left to the 'informed discretion' of the agency." *Providence Rd. Cmty. Ass'n v. EPA*, 683 F.2d 80, 82 (4th Cir. 1982) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).

[10]    "Standard Service" charges include the power used by LPCs for sales to their residential and small commercial and manufacturing customers.

percent because TVA determined that this class of customers paid more under existing rates than what it costs TVA to serve them. (*See* Ex. 1, Final EA, Executive Summary at i.) This adjustment required a small increase for certain other customers in order to maintain revenue neutrality. (*Id.* at 17-18.) TVA concluded that none of the alternatives studied—including Alternative C1—would change the amount of revenue collected by TVA (Ex. 2, FONSI at 2), nor would it result in "any alterations of TVA operations" or "require any changes to TVA's generation and transmission systems." (Ex. 1, Final EA at 51.)[11]

TVA concluded that the preferred rate change alternative would not be a major federal action significantly affecting the environment—meaning that an EIS was unnecessary—and issued a FONSI. The rate change was approved by the TVA Board of Directors in May 2018. (Compl. ¶¶ 74-75.)[12]

---

[11]     A more detailed discussion of Alternative C1 can be found in the Final EA at pages 16-18, 40-43, 50-52, 58, 60, 62, and 64.

[12]     Plaintiffs allege that the rate change did not become final until August 2018 when "the Minutes of the May 10, 2018 meeting were approved." (*Id.* ¶ 76.) Although not pertinent to this motion, Plaintiffs are incorrect. A TVA action becomes final upon the Board's approval; as to the rate change, this approval occurred on May 10, 2018.

## ARGUMENT

## I.     Plaintiffs Lack Constitutional Standing to Pursue Their NEPA Claim Against TVA.

It is well settled that under the case-or-controversy requirement of Article III of the U.S. Constitution, federal courts cannot exercise subject matter jurisdiction over cases where parties lack standing.[13] U.S. Const. art. III, § 1; *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-94 (2009); *Florida Wildlife Fed'n, Inc. v. S. Florida Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011). Specifically, in the context of an environmental lawsuit, the Supreme Court has stated that in order to meet Article III's standing requirement, a plaintiff has the burden to establish the following criteria:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
> (2) the injury is fairly traceable to the challenged action of the defendant; and
> (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "All three elements are an 'irreducible constitutional minimum,' and failure to show any one results in a failure to show standing." *Koziara v. City*

---

[13]     Dismissal for lack of standing is treated as dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232-33 (11th Cir. 2008) (citing cases).

*of Casselberry*, 392 F.3d 1302, 1304-05 (11th Cir. 2004) (quoting *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

As the Supreme Court has explained, "conclusory" statements about injury

and causation are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 560 (2007); *see also, e.g.*, *Warth v. Seldin*,

422 U.S. 490, 507 (1975). The pleadings must, instead, move the claims "across

the line from conceivable to plausible." *Iqbal*, 556 U.S. at 683.

## A.     Plaintiffs cannot show injury-in-fact.

Plaintiffs' alleged injuries are purely conjectural and speculative. Plaintiffs

claim that TVA's 2018 rate change dis-incentivizes residents of the seven states in

TVA's service area, including their members, from investing in and adopting

renewable energy and energy efficiency measures. (Compl. ¶¶ 9, 11, 13, 15, 17.)

The allegations in paragraph 9 are representative of the allegations by the five

named Plaintiffs:

> [Plaintiffs] are harmed by TVA's failure to comply with NEPA in
> imposing the Anti-Solar Rate Changes because these changes will
> both dis-incentivize investments in rooftop solar systems and reduce
> the benefits of energy efficiency or other measures that would reduce
> electricity generated from TVA's polluting energy sources. Those
> polluting energy sources, in turn, release toxic pollutants and
> greenhouse gas emissions that endanger the environment and public
> health, thus further harming [Plaintiffs] and their ability to enjoy
> healthy air and a stable climate.

(Compl. ¶ 9.) While Plaintiffs couch their ultimate injuries as environmental ones that result from purported releases of pollutants and greenhouse gas emissions, the Complaint shows that their injury-in-fact is primarily economic in the form of financial disincentives.

For example, Plaintiffs' general assertions of injury fail to provide any particularized allegation as to an increased risk any of its members face as a result of TVA's rate change. There are no factual allegations that, because of the rate change, any particular member of Plaintiffs' organizations will not install solar panels or adopt energy efficiency measures in their home or work place. There are no factual allegations that any member of Plaintiffs' organizations who have adopted DER have actually lost money or will imminently lose money because of TVA's new rates.[14] There are no factual allegations that members of Plaintiffs' organizations cannot enjoy the air and water quality of their specific natural environment because of emissions of greenhouse gases and other pollutants that are fairly traceable to TVA's decision to change rates. *Cf. Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1135-36 (D.N.M. 2011).

---

[14]     Even if there were these types of allegations, as explained in Section III, *infra*, this is not the type of injury that is within NEPA's "zone of interests."

Because Plaintiffs' allegations of injury in fact are general and require enormous amounts of conjecture, they have failed to establish a cognizable injury in fact.

## B. Plaintiffs' injuries cannot fairly be traced to TVA's reasonable decision in 2018 to adjust rates.

Plaintiffs' Complaint does not provide "a causal connection between the injury and the conduct complained of" because it fails to include any plausible allegations connecting Plaintiffs' ability to "enjoy heathy air and a stable climate" to a harm that is even fairly traceable to TVA's decision to change rates. *Lujan*, 504 U.S. at 560; *see also Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1002-03 (11th Cir. 2004) (describing second prong simply as "causation"); *31 Foster Children v. Bush*, 329 F.3d 1255, 1263 (11th Cir. 2003) (same); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Allowance*, 304 F.3d 1076, 1080 (11th Cir. 2002) (same); *Miller v. Stuart*, 117 F.3d 1376, 1385 (11th Cir. 1997) (requiring a "causal link").

Plaintiffs' Complaint is premised on the conclusory allegation that TVA "violat[ed] NEPA by failing to disclose and consider the reasonably foreseeable environmental impacts" of the 2018 rate change. (Compl. ¶ 5.) Plaintiffs' theory of causation can be summed up as follows: TVA's new rates dis-incentivize residents in TVA's service area from adopting solar power and energy efficiency measures, which in turn, encourages them to increase their usage of "dirty electricity derived

13

from coal and other polluting energy sources" (Compl. ¶ 1), which in turn, "release toxic pollutants and greenhouse gas emissions" (*id.* ¶ 9), which in turn, "endanger the environment and public health" (*id.*), and, as a result, Plaintiffs' "ability to enjoy healthy air and a stable climate" is harmed. *Id.* Plaintiffs' theory of causation is purely speculative.

The Eleventh Circuit has "cautioned [courts] not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002). Instead, a complaint must show an actual causal connection between the particular risk or injury to the plaintiff and the particular conduct of the defendant. *Allen v. Wright*, 468 U.S. 737, 752, 755-56, 764-66 (1984), *abrogated on other grounds by Lexmark Int'l, Inc., v. Static Control Components*, 572 U.S. 118 (2014); *see also ASARCO Inc. v. Kadish*, 490 U.S. 605, 615-16 (1989) (Kennedy, J.).

*Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) (en banc) is instructive as to whether a theory of causation is speculative. There, the Secretary of the Treasury expanded a tax credit for adding certain types of alternative fuel additives known as ethyl tertiary butyl ether ("ETBE") to gasoline. *Bentsen*, 94 F.3d at 662. Because the Secretary did not prepare an EIS, the Florida Audubon Society and other plaintiffs sued to enjoin the tax credit, alleging a violation of NEPA. *Id.* at 662, 665.

14

The D.C. Circuit, in affirming the district court's dismissal for lack of standing, explained:

> For the tax credit to pose a *substantial probability* of a demonstrably increased risk of particularized environmental damage, the credit must prompt third-party fuel producers to undertake the acquisition of production facilities for ETBE and begin to produce ETBE in such quantities as to increase the demand for ethanol from which the ETBE is derived. This increased demand for ethanol must then not simply displace existing markets for currently-produced ethanol, but in fact increase demand for the agricultural products from which ethanol is made. Again, this demand must not be filled by existing corn or sugar supplies, but instead spur new production of these products by farmers, who must be shown to have increased production at least to some measurable extent because of the tax credit, rather than any one of other innumerable farming considerations, including weather, the availability of credit, and existing subsidy programs. Moreover, any agricultural pollution from this increased production must be demonstrably more damaging than the pollution formerly caused by prior agricultural production or other prior use of land now cultivated because of the ETBE tax credit. Finally, the farmers who have increased production (and pollution) as a result of the tax credit must include farmers in the regions visited by appellants, and they must use techniques or chemicals in such fashion and to such extent as to threaten a demonstrably increased risk of environmental harm to the wildlife areas enjoyed by appellants.

*Bentsen*, 94 F.3d at 669-70 (emphasis added). As explained above, Plaintiffs' causation argument is just as speculative as the *Bentsen* plaintiffs'.

Furthermore, not only did the *Bentsen* plaintiffs fail to demonstrate causation by establishing the "substantial probability" of each individual link occurring, they wrongly assumed that each individual link would be present without consideration

of any outside factors that might break the chain of causation. As the D.C. Circuit

further explained:

> Such a protracted chain of causation fails both because of the
> uncertainty of several individual links and because of the number of
> speculative links that must hold for the chain to connect the
> challenged acts to the asserted particularized injury. Most, if not all, of
> the individual links in the chain alleged by appellants depend on some
> allegation that cannot be easily described as true or false; as noted, we
> routinely refuse to permit such predictive assumptions to establish
> standing.

*Bentsen*, 94 F.3d at 669-70 (citations omitted).

Here, similar to *Bentsen*, Plaintiffs' allegations fail to show how TVA's

decision to change rates displaces other factors in dis-incentivizing the adoption of

solar power and/or energy efficiency measures, such as tax credits; economies of

scale and rates of innovation that reduce the future cost of adopting DER; and

public acceptance and desire to adopt DER despite a marginally higher cost.

Plaintiffs' allegations do not contain sufficient facts to show that TVA's decision

to change rates affects the demand for electricity or displaces other factors, such as

an improving economy with a proportional increased demand for goods and

services; population growth in the Tennessee Valley region; warmer summers and

cooler winters; and other activities that increase the demand for electricity use.

Plaintiffs make no allegations that trace TVA's decision to change rates to the

release of pollutants and greenhouse gases, nor do their allegations explain how the

contribution of any such releases—as opposed to those from other greenhouse gas

16

emitting activities in this country and around the world—would ostensibly endanger Plaintiffs' ability to enjoy air quality and a stable climate. Any such linkage depends "on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO*, 490 U.S. at 615 (Kennedy, J.).

The central purpose of the standing doctrine is to limit the number of potential litigants for any given claim to those with a distinct interest in the subject matter at issue. If this Court were to allow this action to go forward on weak, generalized, and conjectural allegations of injury and causation, it would eviscerate the purpose of standing in this context because it would allow any plaintiff claiming general harm to their ability to enjoy air quality and stable climate to bring suit against TVA and other utilities for making economic decisions regarding the sale of electricity that is generated in part from fossil fuels.

### C.    Plaintiffs cannot establish redressability.

Causation and redressability overlap to the extent that both "assure that proper parties have brought their dispute to the proper branch of the federal government." *Bentsen*, 94 F.3d at 663. But "[r]edressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Id.* at 663-64; *see also Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury

will be redressed by a favorable decision." (internal quotation marks omitted));
*West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) ("When conjecture is
necessary, redressability is lacking.").

Even assuming the Court orders TVA to perform an EIS for its 2018 rate
change, that judicial relief would not alleviate the injuries alleged by Plaintiffs.
The completion of an EIS by TVA would have no effect on greenhouse gas and
emissions that are not tied to TVA's incremental rate change, such as emissions
from industry and vehicles. And an EIS would not affect third-party decisions
around United States, not to mention the entire globe, regarding the emission of
greenhouse gases and other pollutants, which inevitably affect air quality and
pollution in the Tennessee Valley. Nor would it have an effect on individuals and
entities in their decisions to adopt (or not adopt) DER and/or increase (or not
increase) their energy consumption. None of the millions of independent actors
both inside and outside TVA's service territory who contribute to the injuries
Plaintiffs complain of would be affected by a court order for TVA to perform a
more lengthy review of its rate change. Thus, the chances of a court order in this
case alleviating any of the injuries Plaintiffs complain of is completely speculative
and conjectural.

18

## II.   Even If Plaintiffs Could Establish Article III Standing, They Lack Prudential Standing Because They Assert Generalized Grievances Best Suited to Resolution by Other Branches of Government.

Even assuming that Plaintiffs have established Article III standing, this Court must determine whether, as a prudential matter, it should adjudicate their claims.**15** *See, e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (noting that prudential standing limitations prevent a court from adjudicating "questions of broad social import where no individual rights would be vindicated and . . . limit access to the federal courts to those litigants best suited to assert a particular claim"); *Oti Kaga, Inc. v. S. Dakota Hous. Dev. Auth.*, 342 F.3d 871, 880 (8th Cir. 2003) ("[A] plaintiff may have Article III standing but the claimed injury may run afoul of prudential standing because its effects are indistinct from those

---

**15**     Historically, federal courts have analyzed challenges to prudential standing under three different concepts: "(1) the rule against the adjudication of generalized grievances, (2) the rule barring claims that fall outside 'the zone of interests' protected by a statute, and (3) the rule prohibiting plaintiffs from asserting the rights of third parties." *Adson5th, Inc. v. Bluefin Media, Inc.*, 16-CV-143, 2017 WL 2984552, at *6 (W.D.N.Y. July 31, 2017). As discussed in footnote 18, *infra*, the Supreme Court clarified in *Lexmark*, 572 U.S. at 127, that the "zone of interests" inquiry is one of statutory interpretation, not one of standing, and should be analyzed under Rule 12(b)(6). However, the Supreme Court indicated that the "generalized grievance" inquiry stemmed from constitutional, not "prudential" concerns. *Id.* at 127 n.3. After *Lexmark*, courts from different jurisdictions have maintained this distinction. *See, e.g.*, *Chandler & Newville v. Quality Loan Serv. Corp. of Washington*, No. 03:13-CV-02014-ST, 2014 WL 2526564, at *4 (D. Or. June 3, 2014) (noting that, in *Lexmark*, "the Court whittled prudential standing down to, at most, two principles which bar a plaintiff from raising another's legal rights and adjudicating generalized grievances."); *see also Maher Terminals, LLC v. Port Auth. of New York & New Jersey*, 805 F.3d 98, 105-06 & n.5 (3d Cir. 2015) (noting that "[w]e have previously categorized the zone-of-interests requirement as one of three components of prudential standing," including the requirement about general grievances, but observing that *Lexmark* "clarified . . . the zone-of-interests requirement"). Thus, "it is relatively clear that . . . the 'prudential' issue of whether a suit is barred by the rule against the adjudication of generalized grievances ought to be raised in a Rule 12(b)(1) motion." *Adson5th, Inc.*, 2017 WL 2984552, at *6.

felt by persons generally, thus depriving the plaintiff of a unique stake in the controversy."). Like their constitutional counterparts, these judicially self-imposed limits on the exercise of federal jurisdiction are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498. Most relevant here is "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004), *abrogated on other grounds by Lexmark*, 572 U.S. at 128-29; *see also Apache Bend Apartments, Ltd. v. U.S. ex rel. IRS.*, 987 F.2d 1174, 1179 (5th Cir. 1993) ("Among the reasons underlying the rule barring adjudication of generalized grievances is the recognition that other governmental institutions may be more competent to address questions of wide public significance.").

Plaintiffs' Complaint can be read as a generalized grievance about pollution and air quality. They simply claim that the 2018 rate change will result in TVA producing more of what they characterize as "dirty electricity" and that this will harm the various organizations' members who live throughout TVA's service territory because it will "endanger the environment and public health." (*See* Compl. ¶¶ 9, 11, 13, 15, 17.) Accepting for argument's sake the veracity of these allegations, the injuries suffered by Plaintiffs are no different than what would be suffered by the general population in TVA's seven-state service territory. And "the

Supreme Court has made it clear that when the asserted harm is a generalized grievance shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Apache Bend Apartments, Ltd.*, 987 F.2d at 1178 (internal quotation marks omitted).

Moreover, Plaintiffs' alleged injuries, at their core, implicate broader political and policy-based decisions, which are "more appropriately addressed in the representative branches." *Elk Grove Unified Sch. Dist.*, 542 U.S. at 12. TVA already is subject to and complies with emissions standards promulgated under the Clean Air Act's "comprehensive" regulatory process, *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 848 (1984), through which the Environmental Protection Agency ("EPA") determines whether and how greenhouse gas emissions should be regulated.[16] TVA is not statutorily required, either under its own statute or any other one, to use a particular mix of generation for the production of electricity. If Plaintiffs believe TVA should do more to increase reliance on solar energy, incentivize other DER measures, and further

---

[16]   The same is true for any water pollution (*see* Compl. ¶ 17) that would allegedly result from the rate change, as EPA has delegated to the states in TVA's service territory the authority to manage water pollution. *See, e.g.*, *Tenn. Clean Water Network v. TVA*, 905 F.3d 436, 439 (6th Cir. 2018) ("The CWA . . . allow[s] the states to administer the CWA's . . . permitting program themselves, provided their regulations are at least as stringent as the federal limitations.").

decrease use of fossil and other traditional fuel sources (e.g., nuclear and gas),[17] the correct avenue for effectuating this change is not a decision by a federal court in a procedural NEPA lawsuit. It is policy implementation at the legislative and executive branches of government.

For example, Plaintiffs could petition EPA to promulgate regulations requiring reductions of such emissions from a variety of sources, including stationary sources, such as TVA's power plants. Additionally, they could request that the Department of Energy implement increased energy efficiency standards or programs to increase accessibility to solar and other renewable energy sources. Perhaps the most effective option would be to ask Congress to amend the TVA Act (or enact other legislation applicable to TVA) requiring that renewable energy sources and/or DER be incentivized by TVA at a particular level.

These types of "incremental step[s]," *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007), from Congress and federal agencies—not the federal courts—are the appropriate way to attack the environmental, social, or economic issues identified by Plaintiffs. Because a federal court is not a legislator or a regulator, it cannot address these issues by requiring TVA to perform an environmental review for a

---

[17]  As noted, *supra* n.4, 54% of TVA's electricity is generated carbon-free, and TVA's coal-fired generation went from 58% of the total generation load in fiscal year 2007 to 26% in fiscal year 2018. *See* TVA, Our Power System, *available at* https://www.tva.gov/Energy/Our-Power-System.

discrete, incremental rate change. As a prudential matter, the Court should decline

to adjudicate Plaintiffs' Complaint.

### III. Because Plaintiffs' Alleged Injuries Implicate Economic Concerns, They Are Not Within NEPA's "Zone of Interests" and Their Complaint Should Be Dismissed for Failure to State a Claim.

Under the APA, a NEPA plaintiff must show that "there has been a final

agency action adversely affecting [them]," and that, as a result, their "injury falls

within the 'zone of interests' of the statutory provision that the plaintiffs] claim[]

was violated." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir.

2006); *see also* 5 U.S.C. § 702. Here, Plaintiffs must show that their claims fall

within NEPA's "zone of interests"—to protect and promote the quality of the

natural or physical environment. *See* 42 U.S.C. § 4331(a)–(c); 40 C.F.R. §

1508.14; *Metro Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772

(1983).**18**

Plaintiffs' main claim is that TVA's 2018 rate changes discourages the

development of DER in three primary ways:

> First, the[y] reduce electricity rates for large commercial customers,
> thus removing financial advantages of DER investment. Second,

---

**18**      Recently, the Supreme Court clarified that the "zone of interests" should be analyzed under the framework of whether Congress intended a cause of action under the relevant statute, rather than for lack of subject matter jurisdiction under the judicial doctrine of prudential standing. *Lexmark*, 572 U.S. at 127-28. Thus, this claim is analyzed under Federal Rule of Civil Procedure 12(b)(6). *Austin v. Alabama Dep't of Transp.*, No. 2:15-CV-01777-JEO, 2016 WL 6699307, at *6 (N.D. Ala. Nov. 15, 2016) (treating NEPA "zone of interests" claim under Rule 12(b)(6)).

the[y]—for the first time—impose a Grid Access Charge ("GAC")
which will require [LPCs] to charge residential and small business
customers a mandatory fee regardless of electricity usage, thereby
impeding DER adoption in this customer class. Finally, TVA is
discounting the price of electricity for greater electricity usage,
discriminating against consumers who consume less energy or who
implement energy efficiency measures.

(Compl. ¶ 1.) Plaintiffs' allegation of environmental harm is premised on

conjecture and extrapolation from Plaintiffs' alleged economic injury. NEPA does

not require review of agency decisions that have primarily an economic impact

with tenuously remote environmental impacts. The Supreme Court has made clear

that federal actions that have primarily economic, or even socioeconomic, effects

on the human environment, but do not have a primary impact on the physical

environment, do not trigger NEPA concerns. *See Metro. Edison Co.*, 460 U.S. at

778; *accord Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184,

194 (3d Cir. 2016) (surveying multiple NEPA "zone of interests" cases and

explaining that "[t]he vast majority of NEPA authority makes clear that economic

injury alone does not satisfy the statute's zone of interests test"); *Ashley Creek*

*Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (collecting cases);

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1287

(D.C. Cir. 2005) (same); *Cent. S. Dakota Coop. Grazing Dist. v. U.S. Dep't of*

*Agric.*, 266 F.3d 889, 895 (8th Cir. 2001) (same).

While litigants need not be "pure of heart" in their motivation to sue, NEPA "cannot be used as a handy stick by a party with no interest in protecting against an environmental injury to attack a defendant." *Town of Stratford v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002). To be among those that Congress intended to bring suit under NEPA, a plaintiff's actual interests must substantially align with the protection of the physical environment. Plaintiffs' economic and socioeconomic claims, thinly veiled under the guise of conjectural environmental harm, do not make the requisite showing and should be dismissed.

## CONCLUSION

For any of the reasons articulated above, Plaintiffs' Complaint should be dismissed.

Respectfully submitted,

*s/Frances Regina Koho*
David D. Ayliffe (TN BPR 024297)
Associate General Counsel
Frances Regina Koho (TN BPR 029261)
Steven C. Chin (TN BPR 030011)
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.2410
frkoho@tva.gov

Attorneys for Tennessee Valley Authority

79335514

25

## CERTIFICATE OF SERVICE

On November 13, 2018, I electronically filed this document through the ECF

system, which will send a notice of electronic filing to:

> R. David McDowell, Esq.
> Law Office of R. David McDowell
> 121 Jefferson Street N.
> Huntsville, Alabama 35801
> Telephone 256.564.7474
> RDavidMcDowell@gmail.com
>
> Howard M. Crystal, Esq.
> Anchun Jean Su, Esq.
> Center for Biological Diversity
> 1411 K Street NW, Suite 1300
> Washington, D.C. 20005
> Telephone 202.849.8399
> hcrystal@biologicaldiversity.org
> jsu@biologicaldiversity.org
>
>
> *Attorneys for Plaintiffs*


*s/Frances Regina Koho*

*Attorney for Tennessee Valley Authority*