FILED
2018 Dec-21  AM 10:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TENNESSEE VALLEY AUTHORITY,<br>Defendant. | No. 3:18-cv-01446-LCB |

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO TVA'S MOTION TO DISMISS

---

Howard M. Crystal (DC Bar No. 446189)*
Anchun Jean Su (DC Bar No. CA285167)*
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
Tel: (202) 849-8399
Email: hcrystal@biologicaldiversity.org
        jsu@biologicaldiversity.org

*Admitted *pro hac vice*

R. David McDowell
State Bar No. MCD023
LAW OFFICE OF R. DAVID McDOWELL
121 Jefferson Street N
Huntsville, AL 35801
Tel: (256) 564-7474
Fax: (256) 564-7473
E-mail: rdavidmcdowell@gmail.com

*Counsel for Plaintiffs*

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................5

  A. The National Environmental Policy Act .......................................................5

  B. Factual Background .......................................................................................7

    1. TVA's Electricity Generation And Past Treatment of Renewables .............7

    2. TVA's 2018 Anti-Solar Rate Changes.......................................................8

    3. TVA's NEPA Process On The Anti-Solar Rate Changes..........................11

ARGUMENT ......................................................................................................12

  I.  TVA Fundamentally Mischaracterizes Plaintiffs' Burden Concerning
    Article III Standing. ......................................................................................13

  II. Defendants Also Err In Arguing That Plaintiffs Have Failed To
    Adequately Allege Article III Injury-In-Fact. ...............................................16

    A. For Article III Standing, So Long As The Plaintiff Is Among The
      Injured, It Does Not Matter Whether The Injury Is Also Experienced
      By Others......................................................................................................16

    B. Plaintiffs Have Also Demonstrated A Sufficient Causal Connection
      Between TVA's Rate Changes And Plaintiffs' Underlying
      Environmental Injuries. ...............................................................................20

  III. Plaintiffs' Injuries Are Not Economic, And Fall Well Within
    The Scope of NEPA.......................................................................................28

  CONCLUSION ...................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Children v. Bush*,
    329 F.3d 1255 (11th Cir. 2003) ........................................................27

*Alabama-Tennessee Forest Res. L.P. v. TVA*, No. 93-N-2713-NE, 1995 U.S.
    Dist. LEXIS 22644 (N.D. Ala. Mar. 30, 1995) ..............................6

*Am. Canoe v. White*,
    277 F. Supp. 2d 1244 (N.D. Ala. 2003) .................................. 6, 13

*Apache Bend Apts., Ltd. v. United States*,
    987 F.2d 1174 (5th Cir. 1993) ....................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................4

*Austin v. Ala. DOT*, No. 15-01777-JEO, 2016 U.S. Dist. LEXIS 159113
    (N.D Ala. Nov. 17, 2016) ...................................................... 4, 29

*Baltimore Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983).......................................................................5

*Bayou Lawn & Landscape Servs. v. Johnson*,
    173 F. Supp. 3d 1271 (N.D. Fla. 2016) .......................................15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................13

*Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*,
    781 F.3d 1271 (11th Cir. 2015) .................................. 16, 19, 28, 30

*Black Warrior Riverkeeper, Inc. v. U.S Army Corps of Eng'rs*,
    833 F.3d 1274 (11th Cir. 2016) ..................................................2, 3

*Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, No.
    17-439-LSC, 2018 U.S. Dist. LEXIS 137322 (N.D. Ala. Aug. 14, 2018)....15

*Common Cause/Georgia v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ..................................................28

ii

*Conservation Law Found., Inc. v. Jackson*,
    964 F. Supp. 2d 152 (D. Mass. 2013)............................................................27

*Ctr. for Biological Diversity v. U.S. DOI*,
    563 F.3d 466 (D.C Cir. 2009)......................................................................20

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*,
    729 Fed. Appx. 287 (5th Cir. 2018) ........................................................ 3, 15

*Florida Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996)................................................ 21, 22, 25,26

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009)........................................................27

*Gulf Restoration Network v. Salazar*,
    683 F.3d 158 (5th Cir. 2012) ......................................................................15

*Highway J Citizens Group v. United States DOT*,
    656 F. Supp. 2d 868 (E. D. Wis. 2009) ......................................................17

*Jensen v. Pinellas Cnty. Bd. of County Comm'rs*, No. 13-00233,
    2013 U.S. Dist. LEXIS 191905 (M.D. Fla. June 28, 2013) .........................28

*Lanfear v. Home Depot, Inc.*,
    679 F.3d 1267 (11th Cir. 2012) ..................................................................12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................ 3, 13, 14, 15

*Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Allowance*,
    304 F.3d 1076 (11th Cir. 2002) ..................................................................27

*Miller v. Stuart*,
    117 F.3d 1376 (11th Cir. 1997) ..................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
    463 U.S. 29 (1983)......................................................................................13

*Muransky v. Godiva Chocolatier, Inc.*,
    905 F.3d 1200 (11th Cir. 2018) ....................................................................4

*Ouachita Watch League v. Jacobs*,
    463 F.3d 1163 (11th Cir. 2006) .................................................................15

*RB Jai Alai, LLC v. Sec'y of the Fla. DOT*,
    112 F. Supp. 3d 1301 (M.D. Fla. 2015) .......................................... 27, 29, 30

*Rider v. Sandoz Pharms. Corp.*,
    295 F.3d 1194 (11th Cir. 2002) .................................................................27

*Sierra Club v. Johnson*,
    436 F.3d 1269 (11th Cir. 2006) .............................................. 3, 4, 18, 19, 22

*Sierra Club v. Morton*,
    405 U.S. 727 (1972).............................................................................. 2, 17

*Sierra Club, Inc. v. St. Johns River Water Mgmt. Dist.*, No. 14-1877,
    2015 U.S. Dist. LEXIS 151019 (M.D. Fla. Nov. 6, 2015 ............... 15, 16, 30

*Sierra Club v TVA*,
    430 F.3d 1337 (11th Cir. 2005) .................................................................19

*Sinaltrainal v. Coca-Cola Co.*,
    578 F.3d 1252 (11th Cir. 2009). ......................................................... 13, 23

*Speaker v. U.S. Dep't of Hlth. and Human Services CDC & Prevention*,
    623 F.3d 1371 (11th Cir. 2010) ...................................................................7

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009).................................................................................15

*U.S. v. Students Challenging Reg. Agency Procedures*,
    412 U.S. 669 (1973)......................................................... 4, 5, 21, 26, 27, 29

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990).................................................................................27

iv

**Statutes**

5 U.S.C. § 706.................................................................................................2

16 U.S.C. § 831a(b)(5).....................................................................................6

42 U.S.C. § 4321-4333 ....................................................................................2

42 U.S.C. § 4332(C) .........................................................................................5

**Regulations**

40 C.F.R. § 1500.1 ..................................................................................... 5, 25

40 C.F.R. § 1500.3 ............................................................................................5

40 C.F.R. § 1501.4 ............................................................................................6

40 C.F.R. § 1508.8 ..........................................................................................23

40 C.F.R. § 1508.27 ............................................................................... 6, 11, 25

**INTRODUCTION**

This case concerns the Tennessee Valley Authority's ("TVA") failure to disclose and consider the reasonably foreseeable environmental impacts of the agency's 2018 Anti-Solar Rate Changes.  Through these changes in electricity rates, TVA is deliberately causing far fewer of its millions of customers to invest in clean energy technologies like distributed solar systems, thereby leaving these business and residential customers with no feasible alternative to relying entirely on TVA-generated electricity.  For example, subscriptions to TVA's Green Power Providers ("GPP") program have plummeted now that TVA is no longer guaranteeing that new participants will receive at least as much for the electricity the generate as they pay for the electricity they use.  *See* Declaration of Bryan Jacob (Exhibit ("Ex." 1), ¶¶ 4-11.  Given that last year TVA burned more than *42 billion pounds of coal* in eight coal-fired power plants, Complaint, ¶ 28, these Anti-Solar Rate Changes will cause demonstrable environmental impacts as TVA runs these polluting plants, as well as its other fossil fuel plants, more frequently and for longer periods of time than would have been necessary, had TVA customers been less reliant on TVA by investing in self-generating renewable energy systems and energy efficiency solutions.  *Id.* ¶ 49.

Contrary to TVA's assertions, this case does not challenge TVA's authority to make these Anti-Solar Rate Changes.  Rather, in this suit under the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4333, and the
Administrative Procedure Act ("APA"), 5 U.S.C. §706, Plaintiffs simply seek to
compel TVA to comply with its fundamental NEPA obligation to disclose and
consider the environmental impacts of its new electricity rates.  *See, e.g., Black
Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1278
(11th Cir. 2016) (summarizing NEPA's requirements).

Thus far, TVA has concluded – in the Environmental Assessment ("EA")
prepared for most of its new rate changes – that the Anti-Solar Rate Changes will
have no environmental impacts.  Now, largely relying on this same conclusion,
TVA asserts that Plaintiffs may not even *pursue* their legal claims because,
according to TVA, Plaintiffs have not adequately alleged Article III standing.  *See*
TVA Br. In Support of Mot. to Dismiss ("TVA Br.") (Nov. 13, 2018) at 10-24.

To the contrary, Plaintiffs have more than adequately alleged standing to
pursue their legal claims.  Courts have repeatedly rejected TVA's argument that
Plaintiffs' injuries are insufficient simply because these harms will be experienced
by many people.  *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).
Rather, because Plaintiffs' members are "*among* th[ose] injured," *id.,* by the rate
changes, they satisfy Article III. *See* Complaint ¶¶ 9-17 (alleging increased
exposure to air and water pollution, smog, and ozone); *see also* Declarations of

2

Christopher Irwin ("Irwin Dec.")(Ex. 2) and Charise Hansen ("Hansen Dec.")(Ex. 3).[1]

TVA is also mistaken in arguing that Article III standing requires Plaintiffs to demonstrate that, should they prevail here, TVA will rescind or otherwise modify its 2018 Anti-Solar Rate Changes.  TVA Br. at 18.  To the contrary, many precedents explain that because a NEPA case involves a *procedural injury*, it is irrelevant whether the agency, in fact, changes its mind as a result of the required NEPA review.  *See, e.g., Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 Fed. Appx. 287, 291 (5th Cir. 2018); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992).  Rather, this case is about addressing Plaintiffs' *procedural* injury.

That makes sense because, as TVA emphasizes, NEPA does not dictate specific agency decisions, but rather simply ensures that an agency faithfully disclose to the public – and itself meaningfully consider – the impacts those decisions will have on the environment.  *See, e.g., Black Warrior Riverkeeper, Inc.*, 833 F.3d at 1278.   Here, as Plaintiffs will demonstrate when this case reaches

---

[1]     Although plaintiffs need not prove their standing now, *see infra* at 12, out of an abundance of caution they are attaching two declarations addressing TVA's arguments that plaintiffs' injuries are too general for Article III standing.  TVA Br. at 12. As those declarants explain, plaintiffs' members are injured by TVA's Anti-Solar Rate Changes, which will lead to additional pollution in the environments in which they live, work, and recreate, while also raising electricity rates.  Irwin Dec. ¶¶ 4-12 (Ex. 2); Hansen Dec. ¶¶ 4-8 (Ex. 3); *see also Sierra Club v. Johnson*, 436 F.3d 1269, 1276 (11th Cir. 2006) (reiterating that an organizational plaintiff may rest its Article III standing on injuries experienced by its members).

3

the merits, TVA has thus far failed to fulfill this vital obligation with regard to its Anti-Solar Rate Changes.

Accordingly, particularly at this early stage of the case, the only issue the Court must consider is whether Plaintiffs have met their minimal burden of sufficiently alleging Article III standing, including injury. *See, e.g., Austin v. Ala. DOT*, No. 15-01777-JEO, 2016 U.S. Dist. LEXIS 159113, *13-14 (N.D Ala. Nov. 17, 2016) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  As discussed below, Plaintiffs have amply met that minimal burden, having sufficiently alleged injury from the additional pollution TVA will generate as a result of the Anti-Solar Rate Changes, which have been designed expressly to send TVA business and residential customers new  "pricing signals" (TVA Br. at 6-7) designed to discourage them from investing in clean energy solutions.  *See, e.g. Muransky v. Godiva Chocolatier, Inc.*, 905 F.3d 1200, 12011 (11th Cir. 2018) ("a small injury, an identifiable trifle, is sufficient to confer standing")(other citations omitted); *Sierra Club v. Johnson*, 436 F.3d 1269, 1276 (11th Cir. 2006) (finding Article III standing to pursue procedural injuries due to concerns about power plant emissions); *see also U.S. v. Students Challenging Reg. Agency Procedures*, 412

4

U.S. 669 (1973) (finding Article III standing for NEPA challenge to agency rate

change).[2]

## BACKGROUND

### A.     The National Environmental Policy Act

NEPA, America's "basic national charter for protection of the environment,"

40 C.F.R. § 1500.1(a), requires that agencies both "consider every significant

aspect of the environmental impact of a proposed action," and "inform the public

that [the agency] has indeed considered environmental concerns . . . ." *Baltimore*

*Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (citations omitted).  To achieve

these aims, NEPA requires that before an agency undertakes a "major Federal

action[] significantly affecting the quality of the human environment," it must

prepare an Environmental Impact Statement ("EIS") to disclose and consider both

the "environmental impact of the proposed action," and reasonable alternatives.  42

U.S.C. § 4332(C).

The Council on Environmental Quality ("CEQ"), a federal agency within the

Executive Office of the President, has issued NEPA regulations "binding on all

Federal agencies."  40 C.F.R. § 1500.3.  Those regulations require that for any

federal agency action with at least some environmental impact, the agency must

either prepare an EIS, or, at the very least, a relatively more cursory Environmental

---

[2]      Plaintiffs respectfully request oral argument on Defendants' motion at the Court's earliest
opportunity.

Assessment ("EA").  *Id.* § 1501.4.  With respect to the latter, at the end of the EA process, "an agency will reach one of two conclusions [ ]: either that the project requires the preparation of an EIS to details its environmental impact, or that the project will have no significant impact" – in which case the agency issues a Finding of No Significant Impact ("FONSI") documenting the bases for this decision.  *Am. Canoe v. White*, 277 F. Supp. 2d 1244, 1251 (N.D. Ala. 2003) (other citations omitted).  In considering impacts, both beneficial as well as negative environmental impacts must be considered.  40 C.F.R. § 1508.27(b)(1).

Contrary to TVA's suggestion, its compliance with NEPA is not "discretionary," TVA Br. at 7, but required by law.  *See, e.g., Alabama-Tennessee Forest Res. L.P. v. TVA*, No. 93-N-2713-NE, 1995 U.S. Dist. LEXIS 22644 (N.D. Ala. Mar. 30, 1995) (discussing TVA's preparation of an EIS under NEPA). Indeed, because TVA's production of electricity necessarily has environmental impacts, TVA often prepares NEPA documentation, including as part of its Integrated Resource Planning ("IRP") process.  *See, e.g.*, Complaint ¶ 38; *see also* 16 U.S.C. § 831a(b)(5) (Congressional directive for TVA's mission to include "being a national leader in technological innovation, low-cost power, and environmental stewardship").

B. **Factual Background**[3]

1. **TVA's Electricity Generation And Past Treatment of Renewables**

The nation's largest power provider, TVA serves approximately 9.7 million people with electricity in most of Tennessee, and parts of Alabama, Mississippi, Kentucky, and Georgia, North Carolina, and Virginia.  Complaint ¶¶ 27, 29.  As of last year, TVA generated almost half of its electricity from polluting fossil fuels, including approximately 25% from coal-fired power plants.  *Id.* ¶ 28.

TVA sells most of this electricity to Local Power Companies ("LPCs"), through power contracts that also dictate the rates at which those LPCs resell power to end-use customers.  *Id.* ¶ 29.  TVA also sells electricity directly to certain large commercial and industrial customers.  *Id.* ¶ 31.

In recent years, some TVA customers have begun investing in distributed energy resources ("DER"), which can include rooftop solar generation, energy efficiency measures, and energy storage.  These investments, such as rooftop solar panels, generate pollution-free solar electricity, which offset electricity bills in a manner analogous to energy efficiency measures that similarly reduce customer reliance on TVA-generated polluting electricity.  *Id.* ¶ 34.

---

[3]     Because, in resolving a motion to dismiss the Court assumes a plaintiff's recitation of the facts, *see Speaker v. U.S. Dep't of Hlth. and Human Svcs. CDC & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010), Plaintiffs largely rely on the facts alleged in their Complaint.   However, Plaintiffs also provide parallel citations to the Final EA itself, which TVA has attached to its brief.  *See* TVA Br., Att. 1.

## 2.      TVA's 2018 Anti-Solar Rate Changes

Although TVA has claimed to the public – and now to the Court – that fairness among customers is the motivating factor for discouraging solar and related DER development, *see* Complaint ¶ 58; TVA Br. at 1, the agency's mandatory filings with the Securities and Exchange Commission tell a different story.  Thus, as TVA has represented in those filings, customer adoption of self-generating solar systems and other DERs creates "competition" with TVA itself, *See* Complaint ¶ 42, as these "emerging technologies . . . may reduce the demand for centrally provided power."[4]

To address this concern, TVA has, for the first time, modified its rate structure in several ways for the express purpose of discouraging DER development.

*First*, as regards larger businesses, TVA explained its "immediate concern" with leading commercial customers "taking on sustainability goals and committing to purchase up to 100%" renewables.  Complaint ¶ 59 (quoting Final EA at 3).  Because TVA is faced with "flat or even declining" demand, and thus "little need for new energy," Complaint ¶ 58, the agency wants to avoid leaving these businesses with "increased incentives" to invest in renewable energy through the energy savings they will achieve.  *Id.* ¶ 59 (quoting Final EA at 2, 37, 47).

---

[4]       *See* TVA Sept. 30, 2017 Form 10-K, at 23 (available at http://www.snl.com/Cache/c391106979.html  (last visited December 21, 2018).

To counter-act these trends, TVA has now lowered energy rates by millions of dollars for its largest business customers.  *Id.* ¶ 60.  As these businesses' electricity bills go down, TVA anticipates that they will have less interest in investing in solar systems or other measures that might reduce their energy bills, and thus will be more likely to continue relying on TVA-generated polluting energy sources.  *Id.*

*Second*, TVA is similarly concerned with homeowners investing in solar systems and other measures that may reduce demand, claiming that "the current pricing structure over incentivize[s] consumer installation" of DER.  *See* Final EA at Chap. 1, p. 1.  To address this concern, TVA – for the very first time in its history – has introduced a fixed charge that customers will "pay regardless of monthly energy usage."  TVA Br. at 7; *see also* Complaint ¶ 61.

In particular, TVA has reduced its wholesale energy rates by 0.5 cents/kWh, which it will recover through its new "Grid Access Charge."  *Id.*  Collectively, TVA anticipates that this rate change will shift approximately $600 million dollars that rate-payers previously paid each year based on the amount of electricity they used, and instead will recover that sum from a new fixed fee that customers will pay simply to access TVA's services.  *Id.*  These fixed fees will discourage homeowners and communities from investing in self-generated solar energy

9

systems because they will continue to pay the access fee regardless of whether they reduce their reliance on TVA-generated polluting energy sources.

*Finally*, TVA's new rate structure rewards customers for increasing their reliance on TVA-generated power. *Id.* ¶ 63. Thus, while customers consuming less than 1000 kWh per month are experiencing monthly bill increases, energy bills have gone down for those using more, and even further down the more TVA-generated electricity customers consume. *Id.*

These rate changes are expressly designed to change customer decision-making regarding DER adoption, for, as TVA recognizes, "price can be an important driver" for customer decision-making. *Id.* ¶ 64 (Citing Final EA at 47). As a direct consequence, therefore, fewer customers, including large commercial customers, will adopt their own self-generating clean solar systems – or energy efficiency measures – and, as a result, they will necessarily rely more heavily on TVA's centralized and often polluting power supply. Complaint ¶ 49.

In addition, at the same time TVA was rolling out these rate changes, it announced another integrally-related rate change with enormous implications for solar investments among TVA customers. *Id.* ¶ 73. Although, through TVA's GPP program, TVA has always paid solar customers at least as much for the electricity they generate as these customers pay for the electricity they use, in 2018 TVA for the first time decoupled the two rates, and set the rates it will pay

10

customers entering the program in the future at largely below-retail rates—leading to longer payback periods for adopting self-generating solar power. *Id.* ¶ 4, 36, 73; *see also* Jacob Decl. ¶¶ 5-9. As anticipated, in response to this rate change, subscriptions to this vital solar program have plummeted approximately 60% this year. Jacob Dec. ¶ 11 and Attachment.

### 3. TVA's NEPA Process On The Anti-Solar Rate Changes

Although TVA did not conduct any NEPA review on its 2018 changes to the GPP program, the agency issued a Draft EA on the other Anti-Solar Rate Changes, concluding they would not have any discernible environmental impacts. Complaint ¶¶ 43-50. In response, Plaintiffs and others submitted detailed comments identifying the myriad ways in which these rate changes are reasonably likely to impact the environment. *See id.* ¶¶ 51- 57. For example, as the Tennessee Department of Environmental Conservation explained, these new rates will mean "changes in TVA power generation and any resulting ambient air quality pollution," as they "dis-incentivize DER," and thus "limit or inhibit" projects that would provide clean energy in TVA's service area. *Id.* ¶ 57 (quoting agency comments). Commenters also explained that TVA must prepare a full-blown EIS on the rate changes. *Id.* ¶ 53; *see also id.* ¶ 21 (detailing bases for requiring an EIS under 40 C.F.R. § 1508.27).

TVA neither heeded commenters' calls for an EIS, nor modified the EA to address these environmental concerns.  Rather, in the Final EA, TVA contradicted itself by concluding that, although it had designed these rate changes precisely to send new price signals that will influence residential and business customer behavior, in fact these rate changes will not cause any appreciable changes to TVA's customers' energy-use mix, and thus will have no discernible impacts on the environment.  Complaint ¶¶ 65-67; 71-72; *see also* TVA Br. at 9 (summarizing TVA's conclusion that none of the rate changes would "result in 'any alteration of TVA operations'").  On that self-contradictory basis, TVA issued a FONSI and finalized the Anti-Solar Rate Changes without further NEPA review.

## **ARGUMENT**

While TVA repeatedly – and erroneously – asserts that Plaintiffs' standing allegations are too general, TVA misunderstands that Plaintiffs need not *prove the merits of their case* at this stage.  Rather, it is well-established that Plaintiffs simply must demonstrate that their "allegations [are] enough to raise a right to relief above the speculative level . . . ."  *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012) (citations omitted).   Moreover, with respect to Article III standing in particular, the Supreme Court has emphasized that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," for "we presum(e) that general allegations embrace those

12

specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (other citations omitted).

Here, Plaintiffs' Complaint provides substantial details concerning both the rate changes TVA has made, and the environmental harms they are reasonably likely to cause. *See* Complaint ¶¶ 6-18; ¶¶ 27-76.  That is all that is required. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (reiterating that a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests") (other citations omitted).

Moreover, at this early stage of the case the Court "construes the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged . . . in the complaint as true." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009).  Applying this lenient standard, Defendants have not remotely demonstrated that Plaintiffs may not pursue their claims. *See also Iqbal*, 556 U.S. at 663 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable . . . .").[5]

---

[5]     When this case reaches the merits, the Court will be called on to review the administrative record before the agency, and consider whether, in making its decision that the Anti-Solar Rate Changes would not impact the environment, TVA "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Am. Canoe v. White*, 277 F. Supp. 2d at 1251 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

I.      **TVA Fundamentally Mischaracterizes Plaintiffs' Burden Concerning Article III Standing.**

At the outset, it is critical to set the record straight as to Plaintiffs' burden to sufficiently allege – and ultimately demonstrate – standing in a NEPA case.  In particular, TVA wrongly argues that Plaintiffs cannot show how winning this case could cure their alleged injuries because, even if TVA published an EIS on its rate changes, it would remain "completely speculative and conjectural" whether that EIS would lead to any changes in TVA or third-party decision-making concerning the energy sources used in TVA's service territory.  TVA Br. at 18.

That is not how the procedural injury at the heart of a NEPA case works. Rather, since NEPA is a procedural statute, the Supreme Court has made clear that the causation and redressability prongs of Article III standing are significantly relaxed, and that a plaintiff need only show a reasonable connection between the agency decision being reviewed under NEPA and an underlying environmental concern.  *See, e.g., Lujan*, 504 U.S. at 572 n.7 (1992). As the Supreme Court explained more than twenty-five years ago:

> The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he *cannot establish with any certainty that the statement will cause the license to be withheld or altered*, and even though the dam will not be completed for many years.

*Id.* (emphasis added);  *see also Sierra Club, Inc. v. St. Johns River Water Mgmt. Dist.*, No. 14-1877, 2015 U.S. Dist. LEXIS 151019, \*14-15 (M.D. Fla. Nov. 6, 2015).

Thus, just as the individuals discussed in *Lujan* had no burden to demonstrate that the NEPA process would lead to a change in the dam construction, Plaintiffs here need not show that, should TVA be required to comply with NEPA, the agency will necessarily make a different decision about its Anti-Solar Rate Changes.  *See also, e.g.  Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, No. 17-439-LSC, 2018 U.S. Dist. LEXIS 137322, \*15 (N.D. Ala. Aug. 14, 2018) ("NEPA [simply] directs federal agencies to carefully consider the environmental consequences for their actions . . . ."). Rather, as many courts have explained, "[a] NEPA plaintiff need not show that his requested remedy 'will in fact redress his injury' but only that 'there is *a possibility* that the procedural remedy will redress his injury.'"  *Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 Fed. Appx. 287, 291 (5th Cir. 2018) (emphasis added); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006).[6]

Accordingly, since TVA necessarily *might* make a different decision regarding its Anti-Solar Rate Changes once the agency completes a legally

---

[6]     *See also, e.g., Gulf Restoration Network v. Salazar*, 683 F.3d 158, 167 (5th Cir. 2012); *Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1281 (N.D. Fla. 2016); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (so long as it is "reasonably probable" that the underlying action threatens plaintiff's "concrete interests," the plaintiff has standing).

sufficient NEPA analysis, TVA's challenge to Plaintiffs' Article III standing on this basis must be rejected.

## II.   Defendants Also Err In Arguing That Plaintiffs Have Failed To Adequately Allege Article III Injury-In-Fact.

TVA's argument that Plaintiffs have not adequately alleged Article III injury also must be rejected.  TVA Br. at 11-13; 23-25.  Contrary to TVA's arguments, Plaintiffs neither must show that they are the only ones who will be injured, nor pinpoint precisely which specific TVA power plant will produce the additional pollution causing that injury.  Rather, by law, it is sufficient that Plaintiffs be among those injured by the overall activities in which TVA will engage as a result of the decision under review.  *See, e.g., Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015); *see also Sierra Club, Inc.*, 2015 U.S. Dist. LEXIS 151019, *14-15.

### A.   For Article III Standing, So Long As The Plaintiff Is Among The Injured, It Does Not Matter Whether The Injury Is Also Experienced By Others.

Defendants assert Plaintiffs cannot establish the requisite injury because any "injuries suffered by Plaintiffs" from pollution caused by TVA as a result of the Anti-Solar Rate Changes "are no different than what would be suffered by the general population in TVA's seven-state service territory."  TVA Br. at 20. According to TVA, that fatally undermines Plaintiffs' injuries.  *Id.* at 19-22.

16

Once again, TVA fundamentally misunderstands standing law.  As the Supreme Court long ago established, "the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." *Morton*, 405 U.S. at 734.  Thus, rather than demonstrating that they are the only ones injured, a plaintiff merely must be able to demonstrate being "*among the injured*." *Id.* at 735 (emphasis added)*; see also, e.g.,  Highway J Citizens Group v. United States DOT*, 656 F. Supp. 2d 868, 877 (E. D. Wis. 2009) ("even though hundreds of others may share the same aesthetic interests as [plaintiff's] members, this does not deprive [plaintiff] of standing").[7]

TVA's argument that Plaintiffs' allegations of injury are too "conjectural and speculative," TVA Br. at 11, is also mistaken.  As detailed in the Complaint – and further detailed in the attached declarations – Plaintiffs' members are among those specifically injured by the increased air and water pollution reasonably likely to result from the Anti-Solar Rate Changes.  Thus, for example, Energy Alabama alleges that its Alabama members are harmed by TVA's Anti-Solar Rate Changes, which will lead TVA to "increase its reliance on its existing fossil fuel generation,

---

[7]      TVA's reliance on the First Circuit's decision in *Apache Bend Apts., Ltd. v. United States*, 987 F.2d 1174 (5th Cir. 1993) (see TVA Br. at 21) is misplaced.  In that case, the Court was not concerned about whether the alleged injury was shared by many, but with whether plaintiffs were among those injured. *Id.* at 1178  (recognizing that "standing is not to be denied simply because many people suffer the same injury")(citations omitted).

which [in turn] creates more air pollution," harming those members.  Complaint

¶ 11; *see also, e.g.*, *id.* ¶ 17 (alleging members of another plaintiff organization

"will be impacted by higher air and water pollution emissions caused by the rate

change"); *id.* ¶ 9 (discussing TVA release of "toxic pollutants").

Similarly, as the attached declarations explain, Plaintiffs' members are

concerned about the air and water pollution emitted from TVA power plants in the

vicinity of places they visit.  Irwin Dec. ¶¶ 5-7 (Ex. 2) (explaining how he has

visited the area near the TVA's Bull Run plant "numerous times," and has canoed

right near TVA's Kingston plant which pollutes the air and water); *see also* Hansen

Dec. (Ex. 3) ¶¶ 4-5 (explaining her concern with air and water pollution in and near

her home in Memphis, including from TVA's Allen Plant).

These are all precisely the kinds of injuries that courts have repeatedly

explained give rise to Article III standing.  *See, e.g., Johnson*, 436 F.3d at 1279

("[E]nvironmental plaintiffs adequately allege injury in fact when they aver they

use the affected area and are persons for whom the aesthetic and recreational

values of the area will be lessened by the challenged activity.")(citations omitted).

Thus, for example, in *Johnson*, where plaintiffs alleged a procedural injury due to

lack of adequate notice concerning certain air quality permits, the Eleventh Circuit

concluded plaintiffs there demonstrated sufficient injury through a member

concerned that a power plant's emissions would "harm (his) health and the health

of (his) friends and family," while also having "a negative impact on the aesthetic beauty of the surrounding area."  436 F.3d at 1276.  Explaining that, "the distinction between an alleged exposure to excess air pollution and uncertainty about exposure is one largely without a difference since both cause personal and economic harm," the Eleventh Circuit had no difficulty concluding that the member's legitimate concern sufficed for Article III injury.  *Id.* at 1279 (other citations omitted); *see also, e.g.*, *Black Warrior Riverkeeper*, 781 F.3d at 1280 ("a plaintiff need not prove that their injury can be traced to specific molecules of pollution emitted by the alleged polluter," but rather "[i]t is enough that a plaintiff show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged  in the specific geographic area of concern.")(other citations omitted); *accord Sierra Club v. TVA*, 430 F.3d 1337, 1342-45 (11th Cir. 2005) (standing based on the plaintiff member who visits area near power plant at issue).

Accordingly, Plaintiffs have more than adequately alleged that they will suffer Article III injury as a result of TVA's decisions at issue here.[8]

---

[8]    Although TVA also complains that plaintiffs have not alleged the rate changes have caused their members to stop installing solar or energy efficiency measures, TVA Br. at 12, these kind of allegations are unnecessary.  Rather, so long as the agency action is sufficiently tied to an underlying environmental concern, it is irrelevant whether it impacts the behavior of an individual plaintiff (or plaintiff member).  *See, e.g., Sierra Club v. Johnson*, 436 F.3d at 1277 (rejecting defendants' argument that plaintiffs lacked injury because they did not allege a member would have acted differently absent the procedural injury).

**B.**     **Plaintiffs Have Also Demonstrated A Sufficient Causal Connection Between TVA's Rate Changes And Their Underlying Environmental Injuries.**

TVA further asserts that the connection between TVA's rate changes and the underlying environmental harms at issue is too speculative. TVA Br. at 11-17. Once again, TVA is mistaken.  Plaintiffs' Complaint alleges that TVA's rate changes will lead to concrete environmental harms in several respects.  In sum, by (a) lowering rates for large commercial customers to reduce their interest in renewable energy investments, Complaint ¶ 59; (b) imposing a first-ever fixed charge to force customers into paying approximately $600 million regardless of their energy usage, *id.* ¶  61; and (c) making electricity less expensive for those using the most, *id.* ¶ 63, TVA is changing customer behavior away from renewable energy and energy efficiency.  *Id.* ¶ 49; *see also id.* ¶ 64 (noting how "price can be an important driver" for customer decision-making)  (Citing Final EA at 47).  As a direct result of these efforts, TVA itself will be generating more electricity, which will cause the concrete environmental impacts about which Plaintiffs are concerned.  Complaint ¶ 49.

In a case like this one concerning NEPA procedural injury, that is all that is necessary.  *See, e.g., Ctr. for Biological Diversity v. U.S. DOI*, 563 F.3d 466, 479 (D.C Cir. 2009) (injury that turned on whether third parties "might act in a certain way in the future" does not defeat standing for a NEPA procedural injury claim);

*SCRAP*, 412 U.S. 669 (rejecting standing challenge to NEPA injury premised on third parties' reaction to an agency rate change).

Ignoring these pertinent precedents, TVA strives mightily, but unconvincingly, to compare this case to the D.C. Circuit's rejection of plaintiffs' standing in *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996).  *See* TVA Br. at 14-17.  In that case, where plaintiffs claimed injuries due to concerns that farmers might engage in more polluting practices in response to a federal tax credit concerning ethanol, the D.C. Circuit found the claimed injuries too speculative in light of the many intervening actors between the federal decision at issue and the harms alleged.  94 F.3d at 668-72.[9]  Because plaintiffs there had not made a sufficient showing of these causal connections, the court concluded they did not have Article III standing at summary judgment.  *Id.* at 666.

This case is not even remotely analogous to *Bentsen*, for several reasons.

*First*, while *Bentsen* concerned the diffuse impacts of the tax credit across the country, *id.* at 668, this case concerns the environmental impacts of TVA's rate changes in the Tennessee Valley, where TVA is located.  Thus, for example, as detailed in the attached declarations, Plaintiffs' members live near –  and visit the areas around – TVA power plants, and thus will be directly impacted by the

---

[9]      As the Court there explained, for the tax credit at issue to have impacted plaintiffs would have required not only that it lead to an increased demand for ethanol, but also that this demand in turn would somehow lead farmers to engage in more polluting farming practices in order to meet that demand, and would do so in particular areas across the country where plaintiffs' members visit.  *Id.*

pollution they generate as they are run more frequently and for longer periods as a result of the Anti-Solar Rate Changes.  *See* Irwin Dec. (Ex. 2) ¶¶ 4-12; Hansen Dec. (Ex. 3) ¶ 5; *see also Sierra Club v. Johnson*, 436 F.3d at 1276 (plaintiff suffered sufficient injury in light of having a member who "fishes near" a power plant and recreates in "the surrounding area").

*Second*, while the plaintiffs in *Bentsen* claimed injuries from the pollution that would be caused by farmers' increasing their production, the court held that it had no reason to assume either (a) that companies would produce more ethanol as a result of the tax subsidy, or (b) that, even if ethanol demand increased, farmers would engage in more polluting activities to supply that demand.  94 F.3d at 670-71.

Here, in stark contrast, the only actor at issue is TVA, which has changed its rates expressly to alter customer behavior – and which, as a result, is going to be burning more polluting, fossil fuel energy in the Tennessee Valley than would occur had TVA not changed its rate structure specifically to discourage business and residential customers from investing in activities that would lower their demand for that power.  Thus, the intervening actors at issue in *Bentsen* are simply not present here.

To be sure, TVA's additional reliance on its polluting fossil fuel sources turns on the extent to which TVA customers decide whether to make DER

22

investments.  However, TVA has made absolutely clear that addressing growth in
DER development is "*a primary reason why TVA has proposed a rate change*,"
Complaint ¶ 58 (quoting Final EA at 38) (emphasis added), and, as noted, the
change in the GPP program has already led to plummeting participation in that
program designed to incentivize self-generated solar systems.  Jacob Dec. ¶ 11.

Accordingly, since TVA has made these rate changes precisely in order to
impact DER growth, the agency cannot now be permitted to argue that Plaintiffs
lack standing because the rate changes will not, in fact, diminish that growth.  *See
also*  TVA Br. at 6-7 (explaining the rate changes are designed to "improve
pricing signals" to customers).  Rather, particularly at the pleading stage, the
Court must accept Plaintiffs' entirely plausible allegation that TVA's rate changes
will accomplish their intended purpose, and will therefore impact whether TVA
customers adopt DER technologies – thereby affecting their reliance on TVA-
generated electricity.  *See, e.g., Sinaltrainal,* 578 F.3d at 1260; *see also* Final EA,
Appendix C, at 3 (explaining that one of TVA's "Guiding Principles" is the
recognition that consumers make rational decisions in response to the price
signals established through TVA's rate-setting process); *see also* 40 C.F.R. §
1508.8 (explaining that the "effects" that must be considered under NEPA include

"indirect effects," which are those that may be "later in time," but remain "reasonably foreseeable").[10]

TVA's further argument that customers might decide not to invest in DER for other reasons in addition to TVA's rate changes, and that TVA's power generation is impacted by other factors such as weather and the economy, TVA Br. at 16, are red herrings irrelevant to Plaintiffs' standing.  In short, because those factors would exist *with or without* the Anti-Solar Rate Changes, they are irrelevant to the impacts caused by the rate changes themselves.

Thus, for example, while TVA power plants may be running longer during a particularly hot summer to provide air-conditioning, absent the Anti-Solar Rate Changes more of TVA's business and residential customers would be able to provide some or all of their air-conditioning needs themselves through self-generated clean power systems, which would mean *less* generation from TVA-generated polluting power plants.  It is that change that is the focus of this case, both in terms of the environmental impacts TVA must consider under NEPA, and the injuries about which Plaintiffs are concerned.  TVA's effort to distract the Court with other factors that could also impact TVA's power generation must be rejected.

---

[10]     Nor can TVA disclaim its influence on consumer behavior by relying on the fact that it largely sells wholesale electricity that Local Power Companies resell to end-use consumers, because TVA itself largely dictates those retail prices, and fully anticipates the sought-after results of its Anti-Solar Rate Changes.  Complaint ¶¶ 30-31, 49.

Moreover, TVA's references to the overall economy, population growth, and weather are all the kinds of matters that TVA naturally addresses in its overall IRP process, through which TVA considers its overall generation needs, and prepares an EIS assessing the impacts of various generation alternatives. *See* Complaint ¶¶ 38-41. However, TVA's 2015 IRP deemed the contribution of DER "outside the scope of the IRP," *id.* ¶ 38, and while TVA has begun work on its 2019 IRP – which will, TVA claims, for the first time address DER, *id.* ¶ 40, that process has just begun, and not even a draft of the EIS has yet been issued. *See also* 83 Fed. Reg. 6,668 (Feb. 14, 2018) (Notice of Intent for new IRP and accompanying EIS). Accordingly, by its own admission, TVA has not yet considered, in the NEPA process, the additional impacts of DER development on the environment, separate and apart from broader factors such as weather and the economy. *See also* 40 C.F.R. § 1508.27(b)(1) (noting that NEPA requires consideration of both beneficial and negative impacts); *id.* § 1500.1(b) (explaining agency must conduct NEPA review to inform its decision-making).

*Third*, this case is unlike the D.C. Circuit's ruling in *Bentsen* because, in that case the court also found that the plaintiffs had not even shown how an increased demand for ethanol would lead to increased agricultural demand, 94 F.3d at 669-70 – which would mean the subsidy would not have at all contributed to the alleged underlying harm. Here, the opposite is true. TVA customers have a

25

binary choice: Option 1 is to be forced to purchase TVA's centralized, often polluting electricity, or Option 2 is to make de-centralized investments – be they DER, energy efficiency, or otherwise – to lower their energy demand from TVA. Since it is uncontroverted that TVA's objective in making these rate changes is to influence that binary choice, and drive customers toward continued reliance on TVA-generated power, the court's reasoning in *Bentsen* is wholly inapplicable.

*Finally,* as the Court in *Bensten* emphasized in distinguishing other precedents, *Bentsen* was before the Court on summary judgment, *see* 94 F.3d at 666, a stage at which a reviewing court no longer "accepts [plaintiffs] alleged chain of events if they are unable to demonstrate competent evidence to support each link." *Id.* at 672. At the pleading stage, by contrast, the court in *Bensten* recognized that a reviewing court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (emphasis added).

Indeed, it was on that basis that the Court in *Bentsen* distinguished *SCRAP*, 412 U.S. 669, which is much more closely analogous to this case than *Bensten*. *See* 94 F.3d at 672 (distinguishing *SCRAP*). In *SCRAP*, which concerned NEPA claims over a change in railroad rates, the agency challenged plaintiffs' alleged injury as too speculative because it turned on how the rate change would impact

third party behavior.  *Id.* at 688.[11]  Rejecting this argument, the Supreme Court

explained that because plaintiffs had sufficiently "alleged a specific and

perceptible harm," nothing more was required at the pleading stage.  *Id.* at 689.[12]

Accordingly, here, where the link between TVA's rate changes and the third

party behavior of its customers is much more closely connected, Plaintiffs have

met their minimal burden of alleging Article III standing at the pleading stage of

this case, and *Bentsen*, decided on summary judgment, is simply irrelevant.  *See*

*also, e.g., Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 418 (E.D.N.Y. 2009)

(reiterating that *SCRAP* "is illustrative of the relatively low burden a plaintiff must

meet at the pleading stage in order to establish causation for standing purposes").[13]

---

[11]   As the Court summarized, plaintiffs' standing theory turned on whether the rate change would "cause increased use of nonrecyclable commodities [ ], thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area."  *Id.*

[12]   While subsequent Supreme Court decisions have distinguished *SCRAP*, it remains good law today.  *See Whitmore v. Arkansas*, 495 U.S. 149, 159 (1990) (reiterating that in *SCRAP* the Supreme Court had found the "pleadings alleged a specific and perceptible harm sufficient to survive a motion to dismiss").

[13]   *Accord Conservation Law Found., Inc. v. Jackson*, 964 F. Supp. 2d 152, 163 (D. Mass. 2013); *RB Jai Alai, LLC v. Sec'y of the Fla. DOT*, 112 F. Supp. 3d 1301, 1311 (M.D. Fla. 2015). The other cases relied on by TVA, *see* TVA Br. at 13-14, do not suggest otherwise.  *See, e.g., Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Allowance*, 304 F.3d 1076, 1081 (11th Cir. 2002) (finding Article III standing based on allegations in complaint); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (concerning the admissibility of expert testimony); *31 Foster Children v. Bush*, 329 F.3d 1255, 1263-66 (11th Cir. 2003) (concerning standing to pursue due process rights); *Miller v. Stuart*, 117 F.3d 1376, 1385 (11th Cir. 1997) (finding standing to pursue First Amendment claims).

Finally, it bears emphasizing that, even on the merits, Plaintiffs will not be required to demonstrate that defendants' decision will necessarily have significant environmental impacts to have Article III standing.  *See, e.g., Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009).  Rather, as the Eleventh Circuit has explained, "[t]he Supreme Court has rejected the argument that an injury must be 'significant'; a small injury, 'an identifiable trifle,' is sufficient to confer standing."  *Id.* at 1251 (citations omitted); *see also Jensen v. Pinellas Cnty. Bd. of County Comm'rs*, No. 13-00233, 2013 U.S. Dist. LEXIS 191905, *14 (M.D. Fla. June 28, 2013)(same).

In light of this lenient standard, Plaintiffs have certainly alleged all that is required – and much more – at this early stage of the case.

## III.   Plaintiffs' Injuries Are Not Economic, And Fall Well Within The Scope of NEPA.

Finally, TVA argues that Plaintiffs' claims do not fit within NEPA's zone of interests because, TVA claims, Plaintiffs' claims focus on "alleged economic injury."  TVA Br. at 24.  Here again, TVA is wrong both on the facts and the law.

As a threshold matter, as the Eleventh Circuit has explained, "[t]he zone-of-interests test is not meant to be especially demanding."  *Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1282 (citations omitted).  Rather, it merely serves to ensure that a plaintiff does not hijack a federal statute to pursue matters Congress did not intend the statute to address.

28

Here, contrary to TVA's factual assertions, Plaintiffs are not asking the Court to review the 2018 Anti-Solar Rate Changes, through the "backdoor" or otherwise.  TVA Br. at 1.  Rather, as Plaintiffs' Complaint makes plain, Plaintiffs are challenging whether, in imposing those rate changes on its customers, TVA has complied with NEPA and the APA.  Complaint ¶¶ 77-81.

To be sure, resolving those issues will require considering the impacts that TVA's rate changes are likely to have on DER development as a result of economic decision-making.  However, the applicable legal precedents make clear that the mere fact that it is through its rate structure that TVA is changing customer behavior, which in turn causes environmental impacts, does not somehow remove TVA's decision from NEPA's requirements, or place Plaintiffs' concerns outside NEPA's zone of interests.

Indeed, in *SCRAP*, the Supreme Court had no concerns about whether plaintiffs could bring a NEPA challenge over the rate change at issue.  412 U.S. 669.  That is because, contrary to TVA's argument, even where a plaintiff's injuries "are primarily economic," a plaintiff has standing where he has "alleged other injuries as well."  *Austin,* 2016 U.S. Dist. LEXIS 159113, *17.

Accordingly, here, where Plaintiffs have demonstrable concerns with the concrete environmental impacts caused by the Anti-Solar Rate Changes, they are well within NEPA's zone of interests.  *See also RB Jai Alai, LLC*, 112 F. Supp. at

29

1312 (similarly rejecting argument concerning "allege[d] purely economic injuries"); *accord Sierra Club, Inc.*, 2015 U.S. Dist. LEXIS 151019, *22-23; *see also* Hansen Dec. (Ex. 3) ¶¶ 7-8 (noting her electricity rates, and those of her neighbors, are going up as a result of the Anti-Solar Rate Changes, which will make solar investments less attractive).

Finally, TVA's further argument that Plaintiffs' concerns are more appropriately addressed through other means – such as seeking improved Clean Air Act or Clean Water Act regulations, TVA Br. at 21 – must also be rejected. Plaintiffs are entitled to pursue their NEPA claims irrespective of whether there might also be other means to address their underlying concerns. *See, e.g., Black Warrior Riverkeeper*, 781 F.3d at 1281 (rejecting argument that plaintiffs lack Article III standing because, in intervenor-defendants' view, plaintiffs should have brought "a different lawsuit" than the one before the court).

For all these reasons, Plaintiffs have standing to pursue their claims under NEPA and the APA.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

December 21, 2018                    Respectfully submitted,


                                     */s/ Howard M. Crystal*
                                     Howard M. Crystal (D.C. Bar No. 446189)*
                                     Anchun Jean Su (D.C. Bar No. CA285167)*
                                     CENTER FOR BIOLOGICAL DIVERSITY
                                     1411 K Street N.W., Suite 1300
                                     Washington, D.C. 20005
                                     Telephone:  202-849-8399
                                     Email: hcrystal@biologicaldiversity.org
                                              jsu@biologicaldiversity.org

                                     *Admitted pro hac vice*

                                     */s/ R. David McDowell*
                                     R. David McDowell
                                     State Bar No. MCD023
                                     LAW OFFICE OF R. DAVID MCDOWELL
                                     121 Jefferson Street
                                     N Huntsville, AL 35801
                                     Telephone:  256-564-7474
                                     Fax:          256-564-7473
                                     Email: RDavidMcDowell@gmail.com

                                     *Counsel for Plaintiffs*

31

## CERTIFICATE OF SERVICE

On December 21, 2018, I electronically filed this document through the ECF system, which will send a notice of electronic filing to:

Frances Regina Koho
Steven C. Chin
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
frkoho@tva.gov
scchin@tva.gov


_/s/ Howard M. Crystal_
Howard M. Crystal

Attorney for Plaintiffs