**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.,* | |
| Plaintiffs, | No. 3:18-cv-1446-LCB |
| v. | |
| TENNESSEE VALLEY AUTHORITY, | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

R. David McDowell
State Bar No. MCD023
Law Office of R. David McDowell
121 Jefferson Street
N Huntsville, AL 35801
Telephone:  256-564-7474
Fax:          256-564-7473
Email:
RDavidMcDowell@gmail.com

Howard M. Crystal (D.C. Bar No. 446189)*
Anchun Jean Su (D.C. Bar No. CA285167)*
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
Telephone:  202-809-6926
Email: hcrystal@biologicaldiversity.org
          jsu@biologicaldiversity.org

*Admitted pro hac vice*

April 3, 2020

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................3

    I.    TVA'S FOCUS ON THE PURPORTED MERITS OF VARIOUS
         POLICY DECISIONS CANNOT HIDE ITS FAILURE TO
         MEANINGFULLY ADDRESS THEIR ENVIRONMENTAL
         IMPACTS IN VIOLATION OF NEPA....................................................3

    II.   PLAINTIFFS HAVE ARTICLE III STANDING. ...................................5

    III.  TVA MAY NOT BREAK ITS ANTI-DER ACTIONS INTO
         SMALLER COMPONENTS TO DIMINISH THEIR COLLECTIVE
         ENVIRONMENTAL IMPACTS. ..........................................................11

    IV.  TVA MUST PREPARE AN EIS TO EXAMINE THE
         ENVIRONMENTAL IMPACTS OF ITS 2018 RATE CHANGES. ......14

        A. TVA's Efforts To Discourage DER Development Require An EIS
            Because They Are Highly Controversial. ..........................................15

        B. An EIS Is Necessary Because The Rate Changes May Establish A
            Precedent For Future TVA Decisions................................................20

        C. TVA Must Prepare An EIS To Consider Whether These Rate
            Changes Conform With The Agency's Statutory Mandates. ............23

    V.   THE 2018 RATE CHANGE EA FAILS TO TAKE A "HARD LOOK"
         AT ENVIRONMENTAL IMPACTS......................................................26

CONCLUSION ...................................................................................................33

# TABLE OF AUTHORITIES

**Cases**

*Am. Rivers & Ala. Rivers Alliance v. FERC,*
  895 F.3d 32 (D.C. Cir. 2018) ................................................................12

*Bayou Lawn & Landscape Servs. v. Johnson,*
  173 F. Supp. 3d 1271 (N.D. Fla. 2016) .................................................7

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. Of Eng'rs.,*
  781 F.3d 1271 (11th Cir. 2015) .................................................. 2, 6, 14

*Bluewater Network v. Salazar,*
  721 F. Supp. 2d 7 (D.D.C. 2010)........................................... 26, 27, 28

*Coal. on Sensible Transp. v. Dole,*
  826 F.2d 60 (D.C. Cir. 1987) ...............................................................16

*Cold Mountain v. Garber,*
  375 F.3d 884 (9th Cir. 2004) ...............................................................19

*Coliseum Square Ass'n, Inc. v. Jackson,*
  465 F.3d 215 (5th Cir. 2006) ...............................................................19

*Common Cause/Georgia v. Billups,*
  554 F.3d 1340 (11th Cir. 2009). ............................................................6

*Ctr. for Biological Diversity v. U.S. EPA,*
  937 F.3d 533 (5th Cir. 2019) .................................................................9

*Del. Riverkeeper Network v. FERC,*
  753 F.3d 1304 (D.C. Cir. 2014).............................................................11

*Department of Commerce v. New York,*
  139 S. Ct. 2551(2019)............................................................................8

*Friends of Back Bay v. United States Army Corps of Eng'rs*,
    681 F.3d 581 (4th Cir. 2012) ..................................................................26

*Friends of the Earth v. U.S. Army Corps of Eng'rs,*
    109 F. Supp. 2d 30 (D.D.C. 2000)........................................................21

*Georgia River Network v. U.S. Army Corps of Eng'rs*,
    334 F. Supp. 2d 1329 (N.D. Ga. 2003)......................................... 17, 19

*Gerber v. Norton*,
    294 F.3d 173 (D.C. Cir. 2003)..............................................................24

*Helena Hunter and Anglers v. Tidwell*,
    841 F. Supp. 2d 1129 (D. Mont. 2009)................................................19

*Highway J Citizens Grp. v. Mineta*,
    349 F.3d 938 (7th Cir. 2003) ...............................................................17

*Hillsdale Envtl. Loss Prevention, Inc. v. United States Army Corps*,
    702 F.3d 1156 (10th Cir. 2012) .................................................... 16, 17

*Hudson River Sloop Clearwater v. Dep't of Navy*,
    836 F. 2d 760 (2d Cir. 1988) ...............................................................13

*Humane Soc'y of the United States v. Johanns*,
    520 F. Supp. 2d 8 (D.D.C. 2007)..........................................................14

*Jackson Cnty. v. FERC*,
    589 F.3d 1284 (D.C. Cir. 2009)............................................................12

*Jensen v. Pinellas Cnty. Bd. of County Comm'rs*,
    No. 13-00233, 2013 U.S. Dist. LEXIS 191905 (M.D. Fla. June 28, 2013) ..........6

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976)..................................................................... 11, 12

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)..............................................................................24

*Monsanto v. Geerston Seed Farms*,
  561 U.S. 139 (2010) ............................................................................................14

*National Parks Cons. Assn v. U.S. Forest Serv.*,
  177 F. Supp. 3d 1 (D.D.C. 2016) .......................................................................22

*National Parks Conservation Association v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019) ................................................................... 19, 26

*Native Village of Chickaloon v. National Marine Fish. Serv.*,
  947 F. Supp. 2d 1031 (D. Alaska 2013) ..............................................................22

*North Carolina v. FAA*,
  957 F.2d 1125 (4th Cir. 1992) ............................................................................17

*Northeast Utils. Serv. Co. v. FERC*,
  993 F.2d 937 (1st Cir. 1993) ......................................................................... 28, 29

*NRDC v. DOE*,
  2007 U.S. Dist. LEXIS 32374 (N.D. Cal. May 2, 2007) ............................... 15, 17

*Nucleus of Chicago Homeowners Ass'n v. Lynn*,
  524 F.2d 225 (7th Cir. 1975) ..............................................................................12

*Ouachita Watch League v. Jacobs*,
  463 F.3d 1163 (11th Cir. 2006) ..........................................................................10

*Presidio Golf Club v. National Park Serv.*,
  155 F.3d 1153 (9th Cir. 1998) ............................................................................22

*Public Citizen, Inc. v. Trump*,
  297 F. Supp. 3d 6 (D.D.C. 2018) ..........................................................................9

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..............................................................................................2

*Sabine River Auth. v. U.S. Dep't of Interior*,
  745 F. Supp. 388 (E.D. Tex. 1990) .....................................................................22

*Save Strawberry Canyon v. U.S. Dept of Energy*,
  830 F. Supp. 2d 737 (N.D. Cal. 2011).................................................................22

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017)............................................................... 2, 31, 32

*Sierra Club v. Mainella*,
  459 F. Supp. 2d 76 (D.D.C. 2006)............................................................. 27, 30

*Sierra Club v. Marsh*,
  769 F.2d 868 (1st Cir. 1985)....................................................................27

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  295 F.3d 1209 (11th Cir. 2002) ...........................................................30

*Sierra Club v. United States Fish and* Wildlife,
  235 F. Supp. 2d 1109 (D. Or. 2002) ....................................................19

*Southern California Edison Co.*,
  49 F.E.R.C. P61,091 (F.E.R.C. October 27,1989) ...............................28

*Tennessee Envtl. Council v. TVA*,
  32 F. Supp. 3d 876 (E.D. Tenn. 2014)....................................................17

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019)............................................... 10, 32

## Statutes

16 U.S.C. § 2621(a)......................................................................................24

16 U.S.C. § 2621(d)(2)..................................................................................24

16 U.S.C. § 831j............................................................................................25

16 U.S.C. § 831k...........................................................................................25

42 U.S.C. § 4321-4333 .............................................................................1, 2

**Regulations**

40 C.F.R. §1502.14 ....................................................................................4

40 C.F.R. § 1508.25(a)(3) .........................................................................11

40 C.F.R. § 1508.27(b)(10) .......................................................................23

40 C.F.R. § 1508.27(b)(6) .........................................................................20

## INTRODUCTION

In their opening brief, Plaintiffs demonstrated that the Tennessee Valley Authority ("TVA") has failed to properly consider, and disclose, the environmental impacts of the agency's concerted efforts to discourage businesses and homeowners from investing in distributed energy resources ("DER"), through its Anti-DER Rate Changes, as mandated by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4333.

Largely ignoring that fundamental issue, TVA seeks to shift the Court's attention elsewhere: on the agency's *policy* preferences against DER; on TVA's purported plans for its own renewable energy investments; and on the reasons TVA maintains its Anti-DER Rate Changes are justified. TVA's Summary Judgment Memorandum ("TVA Br.") (ECF No. 44). However, as discussed further below, none of these matters have anything at all to do with the *environmental impacts* of TVA's DER-related decisions, which is all this lawsuit is about.

Moreover, when TVA finally gets to the issues at stake here, at every turn the agency seeks to elevate Plaintiffs' burden to heights not only inconsistent with applicable legal standards, but impossible for any plaintiff to satisfy. For example, contrary to TVA's claim, to prevail a NEPA plaintiff need not precisely identify

1

the environmental impacts the agency failed to analyze.  *Id.* at 23-25. That is the

basic purpose of the NEPA process itself – *i.e.*, to discern, evaluate, and disclose

the "reasonably foreseeable" environmental impacts of an agency's actions.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989).

The process would thus be simply irrelevant if a plaintiff is basically

required to do the analysis *itself* in order to obtain relief. In fact, a NEPA plaintiff's

burden to prevail is much more straightforward and manageable: to simply show

that there may be as-yet unexamined environmental impacts that should reasonably

be considered, either alone or together, in order to insure the agency has fulfilled

its basic duty to take a "'hard look' at environmental consequences." *Id.* at 350;

*Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017).

Similarly, to demonstrate Article III standing, a plaintiff is not required, as

TVA claims, to show precisely which pollution is tied to which government

decision. TVA Br. at 16-18. Here, where TVA does not seriously dispute that

reduced levels of DER investment will inevitably mean more polluting fossil fuel

emissions, Plaintiffs amply meet governing Article III standards. *Black Warrior

Riverkeepe*r, *Inc. v. U.S. Army Corps. Of Eng'rs.*, 781 F.3d 1271, 1280 (11th Cir.

2015).

TVA also cannot successfully hide behind its effort to break its Anti-DER

Rate Changes into smaller pieces to diminish their impacts. TVA Br. at 26-29.

Rather, for purposes of both Article III standing, and the merits, the Court must look at TVA's *overall*, systematic efforts to discourage DER, and determine whether TVA has adequately considered and disclosed the collective environmental impacts of those efforts. Because the answer is demonstrably no, the Court should grant Plaintiffs' motion for summary judgment.

## ARGUMENT

**I.    TVA'S FOCUS ON THE PURPORTED MERITS OF VARIOUS POLICY DECISIONS CANNOT HIDE ITS FAILURE TO MEANINGFULLY ADDRESS THEIR ENVIRONMENTAL IMPACTS IN VIOLATION OF NEPA.**

Before turning to the issues actually at stake here, Plaintiffs are compelled to briefly respond to TVA's threshold – and entirely irrelevant – arguments concerning the agency's own plans for clean energy development, and assertion that "Plaintiffs' complaint" is really about "TVA's preference for deploying utility-scale, as opposed to distributed rooftop, solar." TVA Br. at 1; *see also id.* at 2-5. The Court explicitly rejected these arguments in denying TVA's motion to dismiss, Aug. 29, 2019 Mem. Op. (ECF No. 27), and they must be rejected here as well.

In particular, in urging dismissal TVA asserted that "at its core, plaintiffs' lawsuit is an attempt to force TVA to take certain actions such as increase its reliance on solar energy, incentivize DER, and decrease its fossil fuel use." *Id.* at 14. Rejecting this argument, the Court explained that even if this were Plaintiffs'

goal, and even if it could be better achieved through other means, "plaintiffs have chosen to vindicate a *procedural* injury in this case, and the proper method for that vindication is the APA and NEPA." *Id.* (emphasis added).

The Court's reasoning applies equally at summary judgment. The Court should therefore disregard TVA's extended argument on the purported comparative merits of different kinds of solar deployment. TVA Br. at 1-5. It also bears noting that while TVA wants to compare clean energy approaches *now*, by contrast its Final 2018 Environmental Assessment challenged here ("FEA") (AR 7) makes no such comparisons. Since the discussion of just such alternatives is "the heart" of the NEPA process, 40 C.F.R. §1502.14, if TVA's discussion of alternative approaches to clean energy development could have any relevance here at all, it simply highlights that TVA implemented its 2018 rate changes without first considering, under NEPA, the relative environmental impacts of different approaches to providing electricity in the region.[1]

However, once again, the merits of these various policy choices are in fact irrelevant in this case, where the issue is whether TVA has meaningfully

---

[1]      Moreover, while, again, it is irrelevant to this case, TVA's bald assertion that "utility-scale solar provides the greatest benefit for the people of Tennessee Valley," TVA Br. at 1, presents a false choice, for TVA could of course commit to large-scale deployment of utility-scale solar while, *at the same time*, maintaining a rate structure that will naturally lead consumers to continue to make their own DER investments.

considered and disclosed the *environmental impacts* of the policy choices it has made. Accordingly, the Court should not be distracted by TVA's extended frolic and detour. *See also* TVA Br. at 2 (acknowledging that policy "preference makes no difference in this NEPA lawsuit.").

## II.    <u>PLAINTIFFS HAVE ARTICLE III STANDING</u>.

Plaintiffs have demonstrated Article III standing with organizational and member declarations detailing cognizable injuries from TVA fossil fuel plant pollution, *see* Plaintiffs' Declarations ("Pl. Ex.") 1-12, and with concrete evidence that TVA's rate changes are impacting DER development – and thus inevitably the use of TVA fossil fuel resources. Plaintiffs' Opening Brief ("Pl. Br.") (ECF No. 38) at 14-17. TVA's effort to dismiss Plaintiffs' demonstration of standing, TVA Br. at 12-18, must fail.

As a threshold matter, TVA is simply wrong that Plaintiffs must show the precise environmental harms occurring in order to have Article III standing. *Id.* at 17. TVA does not dispute that, as Plaintiffs have detailed, their members live and recreate near polluting TVA fossil fuel plants. Pl. Br. at 4-5. Because the decisions challenged here inevitably will impact the amount of electricity those plants generate, and thus the pollution they emit, Plaintiffs have standing without any need to "prove that their injury can be traced to specific molecules of pollution

emitted . . . ." *Black Warrior Riverkeepe*r*, Inc. v. U.S. Army Corps. Of Eng'rs.*, 781 F.3d 1271, 1280 (11th Cir. 2015); *Am. Fuel & Petrochem. Mfrs.* v. EPA, 937 F.3d 559, 591-96 (D.C. Cir. 2019) (finding Article III standing to challenge nationwide biofuels rule based on concerns about localized impacts as a result of third party actions, without specific evidence of harm).[2]

Equally unavailing is TVA's claim that, to demonstrate standing, Plaintiffs must show precisely how the rate changes will impact TVA's use of fossil fuel resources "irrespective of" other factors like population growth and weather patterns. TVA Br. at 15. Those factors will be present *with or without* the Anti-DER Rate Changes, and thus they are simply irrelevant to the impacts caused by the rate changes themselves.

Thus, for example, while TVA power plants may run longer – and thus pollute more – during a particularly hot summer to provide air-conditioning, without the Anti-DER Rate Changes more of TVA's business and residential customers would be able to provide some or all of the power for that air-

---

[2]  Similarly, Plaintiffs simply need not demonstrate that defendants' rate changes *will* have significant environmental impacts to have Article III standing. *See, e.g., Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009). Rather, as the Eleventh Circuit has explained, "a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Id.* at 1251 (citations omitted); *see also Jensen v. Pinellas Cnty. Bd. of County Comm'rs*, No. 13-00233, 2013 U.S. Dist. LEXIS 191905, *14 (M.D. Fla. June 28, 2013)(same).

conditioning themselves through self-generated clean power systems. This, in turn, would mean *less* generation from TVA-generated polluting power plants.

TVA also seeks to minimize the injuries here by focusing on a single declarant, Mr. Rossow, who does not live near a TVA fossil fuel plant, TVA Br. at 14, and ignoring declarants, like Mr. Irwin, who do. *Compare* Declaration of Jonathon Rossow ("Rossow Decl.") (ECF No. 38-4) (Pl. Ex. 11) *with* Declaration of Chris Irwin ("Irwin Decl.") (ECF No. 38-7) (Pl. Ex. 6). However, while even Mr. Rossow demonstrates sufficient injury because he visits areas near TVA's Kingston Fossil Fuel Plant, Rossow Decl., ¶ 8, the Court need not look farther than Mr. Irwin, a member of one of the Plaintiff organizations who lives and recreates near that Plant. Irwin Decl., ¶¶ 5-9; *see also, e.g.*, *Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1281-1282 (N.D. Fla. 2016) ("As long as one plaintiff in a case has standing, other plaintiffs may remain in the suit" regardless of Article III).[3]

TVA's effort to suggest that Plaintiffs are somehow presenting an attenuated chain of causation must also be rejected. TVA Br. at 15-17. Plaintiffs' injuries are

---

[3]     As Mr. Irwin explains, the Kingston Plant emits large quantities of pollution into the air and water where he lives and recreates. Irwin Decl., ¶¶ 5-9. Similarly, Plaintiff Declarant Victor Scoggin explains his work to clean up the Cumberland River, where several TVA fossil fuel plants are located.  Declaration of Victor Scoggin (ECF No. 38-9) (Pl. Ex. 8), ¶¶ 6-8; *accord, e.g.*, Declaration of Charise Hansen (ECF No. 38-13)(Pl. Ex. 12), ¶¶ 4-5.

caused *solely by TVA*, which both: (a) operates the polluting fossil fuel plants causing adverse impacts experienced by declarants, and (b) controls the rate structure that leads customers to decline DER investments.

The only element requiring any action by others here is the DER investment decisions TVA's rate changes inevitably influence, and there too Plaintiffs have amply met their burden simply to demonstrate that a shift away from business and residential DER development is "the predictable effect of" the rate changes "on the decisions of third parties." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

Indeed, in *Department of Commerce*, the government similarly argued that plaintiffs could not demonstrate causation because they could not prove that the government decision – there, to add a citizenship question to the census – would lead third parties to act in a certain manner. 139 S. Ct. at 2565-66. However, plaintiffs had submitted evidence that "established a sufficient likelihood" that third parties would "react in predictable ways to the citizenship question," and in a unanimous portion of the opinion, the Supreme Court concluded nothing more was necessary. *Id.*; *see also, e.g. Am. Fuel*, 937 F.3d 559 (finding causation based on evidence concerning how farmers will likely react to a change in a national biofuels program).

8

Similarly, in this case, as Plaintiffs have demonstrated (*see* Pl. Br. at 16 and Second Declaration of Bryan Jacob (ECF No. 38-2)(Pl. Ex. 1)), participation in TVA's Green Power Providers ("GPP") Program markedly decreased after TVA decided, for the first time, to offer sub-retail rates for solar-generated electricity – one of the decisions Plaintiffs claim should have been addressed in the NEPA process, but was not. Pl. Br. at 18-20. Indeed, TVA itself has now submitted for the Court's consideration its GPP Cancellation Environmental Assessment (ECF No. 44-5), which states point-blank that after the GPP changes Plaintiffs challenge here, which were made in 2018, "qualitative and quantitative market research, suggests that *the GPP Program is no longer attractive to consumers*." *Id.* at 2 (emphasis added). Thus, TVA itself has recognized that, *as a result of the decisions challenged here*, consumers are, in fact, making new and different decisions to no longer invest in DER systems – which will inevitably mean more TVA fossil fuel power generation. Under *Department of Commerce*, that is more than sufficient to demonstrate causation.[4]

---

[4]     TVA's reliance on *Public Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6 (D.D.C. 2018), is misplaced. TVA Br. at 14. In that challenge to a broad Executive Order that might delay certain regulatory actions, the court concluded plaintiffs had failed to identify *any* discrete injury from the regulations that might be delayed due to the Order. *Id.* at 29-36. Here, by contrast, again, TVA does not dispute the environmental harms caused by its fossil fuel power plants. Similarly, while TVA seeks to rely on the Fifth Circuit's ruling in *Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 537 (5th Cir. 2019), TVA ignores that in that case plaintiffs failed to show the requisite "geographic proximity" to the alleged harm, while here plaintiffs' members live and

TVA's cursory suggestion that evidence concerning the GPP Program "is not properly before the Court" is also mistaken. TVA Br. at 18. *TVA itself has asked the Court to consider the GPP Cancellation EA*. Moreover, it is well-established that a reviewing Court is not limited to an administrative record in evaluating Article III standing. *See, e.g., Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1172 (11th Cir. 2006) (considering evidence contained in scientist declaration in determining plaintiffs' standing in a NEPA suit); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 61 (D.D.C. 2019) ("plaintiffs may submit extra-record evidence to establish standing").

In any event, the data Plaintiffs are relying on, *see* Second Declaration of Bryan Jacob (ECF No. 38-2)(Pl. Ex. 1) and attachments 1 and 2, are *screenshots from TVA's own website*, and TVA itself argues that the Court may consider such materials as "subject to judicial notice . . . ." TVA Br. at 3 n.2. In short, there is simply no basis for TVA's argument that Plaintiffs may not rebut TVA's claim – *i.e.*, that its rate changes will not impact decisions about DER investments – by providing the court with concrete evidence showing that they are having precisely that impact. *See also Am. Fuel*, 937 F.3d 5at 593-94 (considering declaration of Dr.

---

recreate right near TVA fossil fuel power plants, and experience pollution-related adverse impacts from those plants.

Tyler Lark in evaluating potential impact of agency decision to determine Article III standing).

## III.  TVA MAY NOT BREAK ITS ANTI-DER ACTIONS INTO SMALLER COMPONENTS TO DIMINISH THEIR COLLECTIVE ENVIRONMENTAL IMPACTS.

Fundamentally mischaracterizing both the applicable legal standard and Plaintiffs' argument, TVA asserts it was appropriate to consider the rate changes addressed in the 2018 Final Rate Change EA (AR 7) on their own, and to separately address the changes made to the GPP Program.  TVA Br. at 26-29. This is not how NEPA works.

First, as to the legal standard, an agency violates NEPA where it treats similar projects as "separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313-14 (D.C. Cir. 2014) (NEPA does not permit agency to divide "one project into multiple individual actions . . . ."). "[S]imilar timing and geography" are among the "similarities that provide a basis for evaluating their environmental consequences together." 40 C.F.R. § 1508.25(a)(3). As the Supreme Court has explained, where two or more actions that "will have a cumulative or synergistic environmental impact upon a region are *pending concurrently* before an agency, their environmental consequences *must be considered together*." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (emphasis added).

11

TVA tries to muddy the waters here by diverting the Court's attention to the agency's decision to cancel the GPP altogether in February, 2019, many months after the May, 2018 rate changes addressed in the 2018 Final Environmental Assessment ("FEA"). TVA Br. at 26. But those are *not* the two decisions that are the focus of Plaintiffs' Complaint (filed in 2018), and summary judgment memorandum. Rather, Plaintiffs argue that the two decisions that should have been considered together are: (1) the rate changes addressed in the Spring 2018 FEA (AR 7); and (2) the Spring, 2018 decision to, for the first time, decouple GPP rates from retail rates and pay GPP customers less than the retail rate for all the electricity they generate (AR 198-99). *See* Pl. Br. at 19. These two decisions were made *during the same time period*. *Id.*

TVA provides no argument as to why these two decisions, "pending concurrently" (*Kleppe*, 427 U.S. at 410), and covering the same region, should not have been considered together. *Defenders of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1116 (11th Cir. 2013) (it is a "fundamental NEPA principle . . . that connected actions be analyzed together . . . ."); *Am. Rivers & Ala. Rivers Alliance v. FERC*, 895 F.3d 32, 55 (D.C. Cir. 2018) (NEPA document must address "the total impacts and cannot isolate a proposed project, viewing it in a vacuum").[5]

---

[5]     The cases on which TVA relies for this argument, TVA Br. at 28, are inapposite: in one the projects were "geographically distinct," *Jackson Cnty. v. FERC*, 589 F.3d 1284, 1291 (D.C. Cir. 2009); in another, there were not two concurrent decisions at issue, *Nucleus of Chicago*

Nor does TVA have any relevant rejoinder to Plaintiffs' explanation that, had TVA considered the "cumulative or synergistic environmental impact" of these decisions, *Kleppe*, 427 U.S. at 410, the agency would have analyzed the extent to which customers would react to a three-year lengthening of the critical payback period for their solar systems. Pl. Br. at 33-34 and Second Declaration of Bryan Jacob (ECF No. 38-2) (Pl. Ex. 1) ¶ 17; *see also* Pl. Br. at 32-33 (discussing the importance of payback periods for DER decision-making).

Instead, once again mischaracterizing Plaintiffs' argument, TVA suggests Plaintiffs have argued the "payback period for DER investment is allegedly 'more like three years.'" TVA Br. at 23 n.8. In fact, Plaintiffs have argued that, had TVA properly considered all its concurrent rate changes together, the "*difference in* the payback period" before and after the rate changes "would have been revealed to be more like three years, rather than" the one year difference that TVA's analysis of impacts on customer behavior assumed. Pl Br. at 33-34 (emphasis added). Given the importance of the payback period to these investment decisions, this is far from an irrelevant "disagreement," TVA Br. at 23 n.8; it instead reflects evidence of as-yet

---

*Homeowners Ass'n v. Lynn*, 524 F.2d 225, 230 (7th Cir. 1975); and the third concerned a challenge to an EIS, not an EA. *Hudson River Sloop Clearwater v. Dep't of Navy*, 836 F. 2d 760, 761-62 (2d Cir. 1988).

unconsidered potential environmental impacts in light of its bearing on DER investment decisions.[6]

## IV. TVA MUST PREPARE AN EIS TO EXAMINE THE ENVIRONMENTAL IMPACTS OF ITS 2018 RATE CHANGES.

If the Court agrees that, as discussed above, TVA has violated NEPA by failing to consider, in a single NEPA analysis, concurrently pending decisions that discourage DER development, the Court does not necessarily need to go farther to resolve this suit: the Court could simply vacate and remand to TVA with instructions to consider these matters together, and allow TVA to decide, in the first instance, the kind of NEPA review to undertake. *See, e.g., Monsanto v. Geerston Seed Farms*, 561 U.S. 139 (2010).[7]

Nonetheless, TVA's brief only further demonstrates that, in light of the "significance factors" that govern whether an agency must prepare a full-blown

---

[6]    As Plaintiffs have also noted, Pl. Br. at 12 n.14, TVA not only failed to properly consider these decisions together, it simply declared that it need not do any NEPA review *at all* on its May 2018 decision to fundamentally alter the GPP Program, without either invoking a Categorical Exclusion or preparing a separate EA. *See* AR 199. That failure alone violates NEPA. *See, e.g., Humane Soc'y of the United States v. Johanns*, 520 F. Supp. 2d 8, 33 (D.D.C. 2007) (agency violates NEPA where it fails to either conduct NEPA review or invoke a NEPA categorical exclusion).

[7]    In that event, Plaintiffs would urge the Court to vacate the rate changes addressed in the 2018 Rate Change EA, and the changes TVA has made to the GPP Program, pending the NEPA process.  *Id.* (discussing vacatur as an appropriate remedy for NEPA violations). However, the Court could also elect to remand these decisions while they remain in place. *Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, 781 F.3d 1271, 1289 (11th Cir. 2015) ("remedy of remand without vacatur is within a reviewing court's equity powers").

14

EIS, TVA may not move forward with these decisions without first completing such a review.

### A.    TVA's Efforts To Discourage DER Development Require An EIS Because They Are Highly Controversial.

TVA claims the Anti-DER Rate Changes do not trigger the "controversy" factor for an EIS because the agency meaningfully responded to the serious and substantial concerns raised by commenters. TVA Br. at 31-34. However, even a cursory review of the Record reveals that, in stark contrast to the cases on which TVA relies, in this case the agency's Final EA continued to ignore the serious concerns raised by the Tennessee Department of Environment and Conservation ("TDEC"), multi-million dollar businesses, organizations, and private individuals.[8]

Thus, while, as Plaintiffs have noted, TDEC and others urged TVA to grapple with what the environmental effects of its rate changes might actually *be*, Pl. Br. at 24-25, TVA chose not to heed these concerns. Rather, like the Draft EA, which simply stated that the rate changes would have no discernible impact on air or water quality, Draft EA at 39, 41 (AR 1, #49, #51), the Final EA simply

---

[8]    Plaintiffs note that the Administrative Record combines many *individual* comments into *single* AR documents, and thus the 100 AR entries for public comments (*see* AR 64-163) reflect more than *1,700 individual comments*, exponentially more than the mere 63 comments that led to a finding of "controversy" warranting an EIS in *NRDC v. DOE*, 2007 U.S. Dist. LEXIS 32374, *55 (N.D. Cal. May 2, 2007).

reiterated that there "would not be identifiable" impacts from the rate changes.
FEA at 58, 60-61 (AR 7, #165, #167-8).

Moreover, while TVA touts its extensive "response to comments" appended
to the Final EA, TVA Br. at 32, Plaintiffs encourage the Court to review what TVA
actually *says* in those responses. In particular, rather than conduct any of the actual
*analysis* NEPA requires, *see infra* at 29-32 (discussing modeling and other options
to analyze impacts), TVA instead spends many pages repeating the conclusory
statement that its rate changes will not have *any* environmental impacts. *E.g.*, AR 7,
App. D at 110 (AR 7, #311) (responding to TDEC concerns by simply stating that
there "are no identifiable impacts" from the rate change).

This is a far cry from the precedents cited by TVA. Thus, for example, while
TVA relies on the 10th Circuit's ruling in *Hillsdale Envtl. Loss Prevention, Inc. v.
United States Army Corps* (TVA Br. at 31), there was no controversy warranting an
EIS in that case because the agency had undertaken extensive modeling of
reasonably likely environmental effects, which the court extensively summarized.
702 F.3d 1156, 1172-80 (10th Cir. 2012). Here, by contrast, TVA made no effort to
disclose foreseeable environmental effects whatsoever. *See also Coal. on Sensible
Transp. v. Dole*, 826 F.2d 60, 67 (D.C. Cir. 1987) (cited by TVA (TVA Br. at 34),
but rejecting challenge only because agency had made projections about anticipated

16

traffic and other environmental effects, and plaintiff was merely raising "technical disputes").[9]

The Court in *Hillsdale* also expressly noted that "*none* of the federal or state agencies the Corps consulted" raised concerns with the Corps' analysis, 702 F.3d at 1182 (emphasis added) – which entirely distinguishes that case from this one, or others where courts noted the concerns of other agencies in finding a controversy warranting an EIS. *NRDC*, 2007 U.S. Dist. LEXIS 32374, *55; *National Parks Conservation Association v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019).

Nor can TVA legitimately ignore TDEC's concerns here on the grounds that the state agency has no "special expertise . . . ." TVA Br. at 33. TDEC – and Plaintiffs and others' – concerns are not about rate-making, *id.*, but about the effects on air and water quality that are reasonably likely to occur as an inevitable result of TVA's increased reliance on its dirty fossil fuel power sources. *See* Pl. Br. at 24-25

---

[9]     The courts in some of the other cases cited by TVA, TVA Br. at 33, similarly found that any controversy was resolved when the agency meaningfully responded to comments. *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 957 (7th Cir. 2003); *Georgia River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1338 (N.D. Ga. 2003); *Tennessee Envtl. Council v. TVA*, 32 F. Supp. 3d 876, 893 (E.D. Tenn. 2014) (finding TVA "was careful to address the concerns raised during the public comment period"). Moreover, in another of the cases on which TVA relies, TVA Br. at 32, the court concluded the controversy was resolved only because the agency had committed to conduct additional NEPA review.  *North Carolina v. FAA*, 957 F.2d 1125, 1133-34 (4th Cir. 1992) (agency committed to address controversial issues in a "supplemental environmental impact statement").

(summarizing TDEC comments). That is squarely within TDEC's expertise, TVA's protests to the contrary notwithstanding. *See, e.g.,* TDEC Air Pollution Page (discussing agency's mandate "to maintain the purity of the air resources of the State of Tennessee . . . .").[10]

In addition, even as regards the issue of how solar customers might respond to TVA's rate changes, as Plaintiffs have explained (Pl. Br. at 25), the businesses that make their income from solar system sales – and thus are in the expert position to understand how their customers would likely react – also raised serious concerns, which TVA also simply dismissed. For example, while a multi-million dollar solar company urged TVA to at least conduct a "market analysis" to address concerns that the new rates "could have wide ranging negative impacts on the economic viability of investments in DER and DSM technologies," *see* Final EA, App. D at 58 (AR 7, #259-60) (summarizing comment of Southern Current), TVA refused to *conduct any such analysis*.

Rather, although the entire purpose of such an analysis would be to explore the impacts of the rate changes, especially as they would impact businesses, TVA simply declared "the changes [will be too] small" to warrant such modeling efforts,

---

[10]     Available at https://www.tn.gov/environment/program-areas/apc-air-pollution-control-home.html.

without ever explaining *why*. *Id.* at 58-59 (TVA Comment Response); *see also* AR 86 at 2 (Comments of Southern Current). This fundamental failure to reasonably explain the bases for the agency's decision simply highlights the "substantial dispute about the size, nature, or effect" of the rate changes that demonstrates a controversy warranting an EIS. *Ga. River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1338 (N.D. Ga. 2003).

For all these reasons, TVA cannot meaningfully distinguish this case from the D.C. Circuit's recent ruling in *National Parks Conservation Association v. Semonite*, which stands for the proposition that a project is "controversial" and thus warrants an EIS, where government agencies and others with relevant expertise raise legitimate concerns which the agency fails to meaningfully address. 916 F.3d 1075 (D.C. Cir. 2019); *see also, e.g., Helena Hunter and Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1137 (D. Mont. 2009) (same); *Sierra Club v. United States Fish and Wildlife*, 235 F. Supp. 2d 1109, 1134 (D. Or. 2002) (same). In short, while Plaintiffs concur that a project is not controversial simply because some people may oppose it, *Semonite*, 916 F.3d at 1084-85[11], this case presents the precise scenario where an

---

[11]     *See also Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 234 (5th Cir. 2006) and *Cold Mountain v. Garber*, 375 F.3d 884, 893 (9th Cir. 2004) (both cited by TVA (TVA Br. at 32), but both simply standing for the proposition that mere opposition is in itself insufficient to find "controversy" warranting further NEPA review).

EIS is necessary due to a legitimate controversy regarding impacts on DER investment decisions, and therefore on the environment.

### B. An EIS Is Necessary Because The Rate Changes May Establish A Precedent For Future TVA Decisions.

TVA disavows any interest in making future rate changes similar to those challenged here on the grounds that the agency "receives no additional revenue through this rate change action . . . ." TVA Br. at 30. To the contrary, this highly misleading statement only serves to further highlight that the rate changes "may establish a precedent" warranting an EIS. 40 C.F.R. § 1508.27(b)(6).

To be sure, TVA claims the rate changes evaluated in the Final EA are "revenue neutral," TVA Br. at 24, but only because the increased income from TVA's first-ever fixed charges are offset by rate reductions elsewhere, including lower rates for large commercial customers and lower electricity bills for those using the most electricity. *Id*. at 9. However, the assertion entirely ignores the gravamen of this suit: TVA is discouraging business and homeowner investments in DER in order to protect its long-standing monopoly in energy generation, which is the entire source of its income.

That is precisely why the precedential nature of the rate changes also warrants an EIS. TVA has bluntly explained that it is taking these unprecedented

20

steps because "rapidly advancing technology" is creating "competitive and technological changes" impacting the "traditional utility business model." FEA at 1 (AR 7, #108).  Thus, the Final EA makes it clear that as companies and municipalities continue to develop "sustainability goals," and homeowners continue to express interest in DER, TVA will take further actions to continue to discourage these DER investments. *Id.* at 3 (AR 7, #110).

 Having determined – erroneously – that these rate changes have no impact on the environment, there is simply no grounds for legitimate dispute that the decision made here will serve as a precedent for TVA's approach to NEPA review of the inevitable *additional* fixed charges and other rate changes TVA will impose in the future to continue to address these "competitive [ ] changes" from DER development down the road. *Id.*

Indeed, the Final EA concludes that imposing a Grid Access Charge *five times as large* as the one TVA has imposed – from .5 cents/kWh to 2.5 cents/kWh (Alternative D) would *still* have indiscernible air and water quality impacts. *See Id.* at 58-59, 61 (AR 7, #165-66, 168).[12] Accordingly, TVA has already decided that it

---

[12]    According to TVA, a Grid Access Charge of 1 cent/kWh would have shifted approximately $1.2 billion in electricity bills, Final EA at 12 (AR 7, #119), which means that TVA concluded a shift of fully $*3 billion* ($1.2 billion x 2.5) in the way customers pay these costs would still not materially impact DER investment decisions, and thus TVA's generation.

may impose substantially more fixed charges on customers without any need to prepare an EIS – fully implicating this significance factor. *See, e.g., Friends of the Earth v. U.S. Army Corps of Eng'rs,* 109 F. Supp. 2d 30 (D.D.C. 2000) (finding this significance factor weighs in favor of an EIS because "the Corps may feel bound to the conclusions reached in the FONSIs issued" when it consider the same issues in the future).

The cases cited by TVA, TVA Br. at 29-31, do not suggest otherwise, for in those cases either there were either no environmental impacts at issue[13], or no suggestion that the project could be at all related to future actions by the agency.[14]

Moreover, while TVA also relies on the Ninth Circuit's analysis in *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) (*see* TVA Br. at 31), in that case the Court found *an EIS was necessary* because, among other things, the agency had failed to "consider the precedential impact" of its decision to allow a tribe to hunt up to five whales each year off the coast of Washington. *Id.* at 493. Emphasizing the distinction between an EA and an EIS, the Court explained that while the agency

---

[13]    *See Sabine River Auth. v. U.S. Dep't of Interior*, 745 F. Supp. 388, 395 (E.D. Tex. 1990) (no precedent where action would cause "no change in the physical environment").

[14]    *See National Parks Cons. Assn v. U.S. Forest Serv.*, 177 F. Supp. 3d 1 (D.D.C. 2016); *Presidio Golf Club v. National Park Serv.*, 155 F.3d 1153 (9th Cir. 1998); *Native Village of Chickaloon v. National Marine Fish. Serv.*, 947 F. Supp. 2d 1031 (D. Alaska 2013); *Save Strawberry Canyon v. U.S. Dept of Energy*, 830 F. Supp. 2d 737 (N.D. Cal. 2011).

had prepared a "lengthy environmental assessment," "[n]o matter how thorough, an EA can never substitute for preparation of an EIS, if the proposed action could significantly affect the environment," including by taking into account its likely precedential nature. *Id.* at 494; *see also id.* ("Preparation of an EIS thus ensures that decision-makers know that there is a risk of significant environmental impact and take that impact into consideration. As such, an EIS is more likely to attract the time and attention of both policymakers and the public.").

Accordingly, because TVA's failure to meaningfully consider the environmental impacts of these rate changes here will substantially impact TVA's approach to these matters in the future – as the agency continues to address the "competitive [ ] changes" coming from "increased consumer choices" to invest in DER, FEA at 1 (AR 7, #108) – the precedential nature of TVA's actions here also warrant an EIS.

## C.    TVA Must Prepare An EIS To Consider Whether These Rate Changes Conform With The Agency's Statutory Mandates.

Once again seeking to improperly elevate the legal standard, TVA argues that Plaintiffs fail to demonstrate that TVA's challenged decisions "violate TVA's statutory mandates." TVA Br. at 34. That is not the legal test for an EIS to be necessary. Rather, an agency decision may have significant impacts – requiring an EIS – where it simply "*threatens* a violation of law . . . ." 40 C.F.R.

§ 1508.27(b)(10) (emphasis added). Here, as Plaintiffs have demonstrated, Pl. Br. at 26-28, and TVA has failed to seriously rebut, TVA Br. at 34-35, the Anti-DER Rate Changes threaten violations of several of TVA's statutory obligations.

*First*, as TVA recognizes, *id.* at 35, the Public Utility Regulatory Policies Act ("PURPA"), Pub. L. 95–617 (1978), mandates that TVA "consider" and make determinations on certain rate approaches before they are implemented. 16 U.S.C. § 2621(a). While that does not dictate the decision TVA may make, it plainly requires that TVA make affirmative determinations consistent with the Act. *See, e.g., Massachusetts v. EPA*, 549 U.S. 497, 532-34 (2007) (finding EPA failed to properly consider how its decision conformed with its statutory obligations).

TVA has failed to do so here. Thus, for example, PURPA generally prohibits an agency from imposing declining block rates, 16 U.S.C. § 2621(d)(2) (rates for energy use "may not decrease as kilowatt-hour consumption" increases), unless the utility "*demonstrates* that the costs to such utility of providing electric service . . . attributable to such energy component, *decrease as such consumption increases during such period*." *Id.* (emphasis added). However, the Anti-DER Rate Changes at issue here call for declining block rates without any such demonstration at all. *See, e.g.*, Final EA at 17 (AR 7, #124) (discussing "implementation of a declining block rate structure"); *id.* at App. D at 85 (#286) (explaining plans for the "same

24

declining block rate" under each alternative). This threatened violation of PURPA supports preparation of an EIS. *See, e.g., Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2003) ("When a statute requires an agency to make a finding as a prerequisite to action, it must do so.").[15]

  *Second*, TVA's arguments regarding how the Anti-DER Rate Changes are "even-handed," TVA Br. at 35, ignores the undeniable fact that the rate changes both target a specific group of customers (those interested in DER investments) within each class, and benefit the largest commercial customers (whose rates were reduced) over residential customers (whose rates increased). This flies in the face of both TVA's mandate to manage electricity sales "*without discrimination* as between consumers of the same class," 16 U.S.C. § 831k (emphasis added), and to insure that electricity "sale to and use by industry shall be *a secondary purpose*" to the principal goal of providing low-cost power to "the domestic and rural consumers . . . ." *Id.* § 831j (emphasis added). All of these threatened violations of law also counsel in favor of TVA preparing an EIS on its Anti-DER Rate Changes.

---

[15]   As to other PURPA provisions, while TVA may have initially addressed them in 2007, TVA Br. at 35 (citing 2007 Environmental Assessment (AR 175)), TVA fails to address Plaintiffs' contention that, by failing even to *consider* conformity with PURPA in changing the approach it originally decided on in 2007, TVA has also acted in a manner inconsistent with other PURPA requirements. Pl. Br. at 27-28.

*    *    *

Although the presence of even a *single* "significance" factor may warrant an EIS, *Semonite*, 916 F.3d at 1082, in this case, where three separate factors are implicated, TVA must be compelled to prepare an EIS on its Anti-DER Rate Changes. *Friends of Back Bay v. United States Army Corps of Eng'rs*, 681 F.3d 581, 590 (4th Cir. 2012) ("the policy goals underlying NEPA are best served if agencies err in favor of preparation of an EIS when [ ]there is a substantial possibility that the (proposed) action may have a significant impact on the environment.") (other citations omitted).

## V.    THE 2018 RATE CHANGE EA FAILS TO TAKE A "HARD LOOK" <u>AT ENVIRONMENTAL IMPACTS</u>.

Even assuming *arguendo* that the Court were to determine that, on this record, it is not clear that an EIS is necessary to address the rate changes addressed in TVA's 2018 FEA, at bare minimum TVA must be directed to take the requisite "hard look" at environmental impacts in a revised EA, to make its own determination whether an EIS is required. *See, e.g., Bluewater Network v. Salazar*, 721 F. Supp. 2d 7 (D.D.C. 2010). TVA's effort to argue that it fulfilled this obligation in the Final EA under review here, TVA Br. at 20-25, falls well short of the mark.

Claiming that the EA itself contains more than "60 pages of analysis," and that this in turn was based on "thousands of pages of underlying materials and analysis," TVA asserts that it closely examined the relevant environmental impact of its 2018 rate changes. TVA Br. at 24. However, quantity does not necessarily mean quality. *See, e.g., Sierra Club v. Marsh*, 769 F.2d 868, 874 (1st Cir. 1985) ("To announce that these documents – despite their length and complexity – demonstrate no need for an EIS is rather like the mathematics teacher who, after filling three blackboards with equations, announces to the class, 'You see, it is obvious.'").

Indeed, it is simply impossible to reconcile TVA's bald assertions of extended analysis with the agency's terse conclusions in the Final EA that the impacts on air and water quality would be "so small" as to "not be identifiable" or "indiscernible," and result in "essentially no or extremely minor" impacts.   FEA at 58-61 (AR 7, # 165-68). Rather, these are the very kinds of conclusory terms that courts have previously rejected on the grounds that they demonstrate an agency's *failure* to take the precise "hard look" that NEPA requires. *Bluewater Network*, 721 F. Supp. 2d 7; *see also Sierra Club v. Mainella*,  459 F. Supp. 2d 76, 101 (D.D.C. 2006) ("An unbounded term cannot suffice to support an agency's decision because it provides no objective standard for determining what kind of differential makes one impact more or less significant than another."). Thus, for

27

example, in *Bluewater Network*, which concerned a challenge to two EAs prepared for jet ski use in two national parks, the court remanded the agency's EAs because the agency "used conclusory terminology to justify its conclusions" regarding environmental impacts. 721 F. Supp. 2d at 31.

Similarly, here, TVA's conclusory assertions that the rate changes will not impact the environment do not satisfy NEPA.

As Plaintiffs anticipated, *see* Pl. Br. at 31-35, TVA's only defense of its failure to actually analyze the likely environmental impacts of the rate changes is to claim any such analysis would simply be too speculative. TVA Br. at 24-25. However, comparing the two-decades-old cases TVA cites for this argument, *id.* at 25, with recent precedents, including those cited by Plaintiffs, Pl. Br. at 29-30, it is evident that TVA's reliance on uncertainty is misplaced.

The principal case on which TVA relies is *Northeast Utils. Serv. Co. v. FERC*, a NEPA challenge to the merger of two utility companies. 993 F.2d 937 (1st Cir. 1993). Finding "no evidence in the record of identifiable environmental harms" arising from "merely approving a merger between utility companies," *id.* at 958-59 (emphasis added), the Court found no NEPA review necessary.[16]

---

[16]    In reaching that conclusion, the Court distinguished FERC's *own* decision in *Southern California Edison Co*., 49 F.E.R.C. P61,091, 1989 FERC LEXIS 2614 (FERC Oct. 27, 1989),

28

In this case, by contrast, while TVA *claims* that the rate changes will not cause *any* changes in the amount of electricity TVA itself generates, the Record demonstrates that, in fact, such changes are inevitable – and therefore, unlike *Northeast Utils. Serv. Co.* – reveals that TVA has yet to examine reasonably foreseeable environmental impacts.

Indeed, TVA entirely ignores the Record evidence Plaintiffs have relied on to demonstrate that, in fact: (a) TVA should have anticipated that companies and homeowners would respond to these rate changes in predictable ways[17]; (b) TVA not only recognizes this close connection between its rates and customer

---

where the agency itself had required NEPA review on another utility merger in which, as here, there *was* evidence that "new pollutants could be released into" the environment as a result of the agency action under review. *Id.* at *17. Indeed, it bears emphasizing that *Northeast Utils. Serv.* itself involved a challenge to FERC's determination that mergers are *categorically excluded* from all NEPA review, because they generally have no environmental impacts at all. 993 F.2d at 957-58. TVA never invoked any similar categorical exclusion here, making the case even less relevant.

Similarly, while TVA also relies on an unpublished 1977 decision from this district concerning a NEPA challenge to a TVA rate change, TVA Br. at 25 (citing AR 266b), that decision is also entirely unhelpful to TVA, since the court there, recognizing that the NEPA claim was "serious" and TVA's refusal to prepare an EIS was "troublesome" (*id.* at #8773, 8777), only declined to afford relief because plaintiffs were merely speculating that the rate change could impact future, entirely indeterminable decisions as to the "construction of some new facilities." *Id.* Here, by contrast, the rate changes have concrete impacts by discouraging business and residential DER investments, which will inevitably lead to more TVA-generated fossil fuel electricity.

[17]    Pl. Br. at 32-35 (citing AR 81, #6794 (report explaining how DER adoption is "highly sensitive" to rates) and AR 12, #371 (discussing how long-term decisions like DER investments are sensitive to price changes); *see also* AR 15, #738 (same).

behavior[18], it in fact *assumed* customers would respond[19]; while, at the same time, (c) TVA has to date refused to at all consider the synergistic effect of having both imposed a new rate structure designed to discourage DER and dismantled its GPP Program by first making it entirely unattractive, and then canceling it altogether.[20]

Thus, based on the Record in this case, the question is not *whether* the TVA decisions challenged here will have *any* impacts on the environment, but rather *how large* those impacts will in fact be. Accordingly, since the EA erroneously concludes there will be *no* such impacts, TVA's decision is arbitrary and capricious, and the issues must be remanded for TVA to actually confront the evidence before it and provide what TVA itself recognizes is its basic duty to provide a "'rational connection between the facts found and the choice made.'" TVA Br. at 21 (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002)); *see also, e.g., Mainella*, 459 F. Supp. 2d at 101.

---

[18]    Pl. Br. at 32 (citing FEA at 47 (AR 7, #154)) (recognizing price as "an important driver that explains changes in demand") and *id.* at 43 (AR 7, #150) (acknowledging rate changes leading to "reduction in the number of people who choose to install DER").

[19]    Pl. Br. at 32-33 (citing AR 210, #11706 (presentation discussing rate changes leading to dramatic reduction in corporate adoption of DER)) and FEA at 37 (AR 7, #144 (finding that absent the rate changes commercial customers would be left with "increased incentives to pursue uneconomic DER")).

[20]    Pl. Br. at 33-34 (explaining how payback period length dramatically expands when the rate changes and the GPP Program changes are considered together).

That just leaves TVA with the bald claim that any such analysis would be too speculative, and to try to put the onus on Plaintiffs to demonstrate precisely how the rate changes will impact customer behavior. TVA Br. at 24. Again, however, that is not how NEPA works.

Rather, it is the *agency's obligation* to do the requisite analysis, which can often involve modeling and other techniques to evaluate a range of impacts likely to result from the agency's action. Plaintiffs cited numerous cases for that proposition in their opening brief, which Defendants ignore entirely. Pl. Br. at 29-30.

One additional recent precedent that demonstrates this point is the D.C. Circuit's ruling in *Sierra Club v. FERC*, in which plaintiffs challenged whether the agency's EIS had adequately considered the reasonably likely emissions from several proposed natural gas pipelines in the southeastern United States. 867 F.3d 1357 (D.C. Cir. 2017). As here, the agency argued that it has no obligation to conduct such an analysis because those emissions will depend on "uncertain variables, including the operating decisions of individual plants and the demand for electricity in the region." *Id.* at 1374. Rejecting this paean to uncertainty, the Court reiterated that "NEPA analysis necessarily involves some 'reasonable forecasting,'" including making "educated assumptions about an uncertain future." *Id.*; *see also, e.g., WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C.

31

2019) (while an "agency 'need not foresee the unforeseeable, but by the same token neither can it avoid drafting an impact statement simply because describing the environmental effects of and alternatives to particular agency action involves some degree of forecasting").

Following these precedents, to satisfy its basic "hard look" obligation under NEPA, TVA must make some reasonable effort to actually address the reasonably likely environmental impacts from these rate changes and their ultimate impact on TVA fossil fuel generation, rather than simply "throw[ing] up its hands and ascrib[ing] any effort at quantification to a crystal ball inquiry." *Zinke*, 368 F. Supp. 3d at 70 (citation omitted).[21]

Thus, at minimum, the Court should direct TVA to re-consider the environmental impacts of the rate changes addressed in the 2018 Final EA.

---

[21]    Plaintiffs have pointed to TVA's failure to consider both localized air and water pollution emissions, as well as greenhouse gas emissions. Pl. Br. at 28-30. As regards the latter, Plaintiffs note that, as the Court emphasized in *Sierra Club*, Plaintiffs with Article III standing may address *any* concerns about the NEPA process. 867 F.3d at 1366 (Plaintiffs may "object to any deficiency in the environmental impact statement," which "need not be directly tied to the members' specific injuries").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully urge the Court  to grant their motion for summary judgment, and deny TVA's motion for summary judgment.


Respectfully submitted,


/s/ R. David McDowell
R. David McDowell
State Bar No. MCD023
Law Office of R. David McDowell
121 Jefferson Street
N Huntsville, AL 35801
Telephone:  256-564-7474
Fax:        256-564-7473
Email: RDavidMcDowell@gmail.com

Counsel for Plaintiffs

April 3, 2020

/s/ Howard M. Crystal
Howard M. Crystal (D.C. Bar No. 446189)*
Anchun Jean Su (D.C. Bar No. CA285167)*
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
Telephone:  202-809-6926
Email: hcrystal@biologicaldiversity.org
       jsu@biologicaldiversity.org
*Admitted pro hac vice

## CERTIFICATE OF SERVICE

On April 3, 2020, I electronically filed this document through the ECF system, which will send a notice of electronic filing to:

Frances Regina Koho
Maria V. Gillen
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
frkoho@tva.gov
mvgillen@tva.gov


*/s/ Howard M. Crystal*
Howard M. Crystal
Attorney for Plaintiffs