FILED
2020 Sep-30  PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.:  3:18-cv-1446-LCB |
| TENNESSEE VALLEY AUTHORITY | ) ) ) ) | |
| Defendant. | | |

## **<u>MEMORANDUM OPINION AND ORDER</u>**

The plaintiffs, Center for Biological Diversity, Alabama Center for Sustainable Energy, Friends of the Earth, GASP, and Southern Alliance for Clean Energy, filed this lawsuit on behalf of their members alleging that the defendant, Tennessee Valley Authority ("TVA"), violated the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, ("NEPA"), when it enacted a certain set of rate changes in 2018.  On August 26, 2019, the Court denied TVA's motion to dismiss. (Doc. 27).  Before the Court is the plaintiffs' Motion for Summary Judgment (Doc. 37) and TVA's Motion for Judgment on the Administrative Record (Doc. 43).  After the motions were fully briefed, the Court conducted a hearing on June 26, 2020.  For the reasons that follow, the Court finds that the plaintiffs lack standing under Article III of the United States Constitution.

## I. Background

As explained in the Court's memorandum opinion denying TVA's motion to dismiss, TVA is a constitutionally authorized executive branch corporate agency and instrumentality of the United States created by the TVA Act of 1933, 16 U.S.C. §§ 831, et seq.  One of TVA's statutory objectives is to provide adequate, affordable, and reliable electricity to more than nine million people in TVA's seven-state service area.  TVA generates electricity through a variety of methods that it then sells to 154 municipal and cooperative local power companies ("LPCs"), which then distribute it to residential, commercial, industrial, and governmental customers.  TVA also sells electricity directly to some industrial and governmental customers with large or unusual power demands.   The plaintiffs are environmental groups whose thousands of members live and recreate in the areas served by TVA.

In 2018, TVA enacted a new rate structure for its provision of electricity to businesses and individual households.  TVA's rate change reduced the "wholesale Standard Service energy rate" and added a "grid-access charge."  (Doc. 15, p. 8), *see also* (Doc. 1, p. 1).  According to TVA, the purpose of the grid-access charge was to ensure that all customers, including customers who use distributed energy resources ("DERs"), like rooftop solar panels, in addition to power from TVA's grid, contributed to the maintenance of TVA's infrastructure.  TVA's rate change also lowered energy rates for large commercial customers and increased rates for certain

other customers.  TVA also lowered the rate it paid to customers who generated their own electricity through distributed generation ("DG") systems like rooftop solar panels.  In particular, TVA changed the rate at which it bought such power from consumers under its Green Power Providers Program.  ("GPP Program").  Under the GPP Program, customers who generated their own power from solar panels were able to sell that power back to TVA.  Part of the 2018 rate change was to decouple the rate it paid to GPP Program participants from retail rates.[1]  The Court will refer to all of these changes collectively as the "rate change."

According to TVA, the 2018 rate change would not change the amount of revenue collected by TVA nor would it alter any of its operations or require any changes to its generation or transmission systems.  TVA stated that its purpose in enacting the rate change was to "better align its wholesale rates with underlying costs."  (Doc. 15, at 7).  TVA has explained that customers who generate their own power still rely on TVA's power grid to supply energy when they are unable to produce enough.  TVA claimed that the rate change, specifically the grid access charge, sought to ensure that these customers contributed their fair share to maintenance of the power grid.

The plaintiffs have a different interpretation of the 2018 rate change. According to the plaintiffs, TVA's rate change was implemented as a way to

---

[1] The GPP Program was ultimately eliminated in 2019.

discourage both businesses and individual household from adopting DERs, thus making them more reliant on electricity generated by TVA.  Throughout their pleadings and briefs, the plaintiffs refer to the 2018 rate change as the "Anti-Solar Rate Change."  The plaintiffs allege that the rate change disincentivizes the adoption of DER, which will lead to TVA burning more fossil fuels to generate power, which will then lead to environmental damage in the areas where the plaintiffs' members live and recreate.

Before enacting the rate change that is the subject of this litigation, TVA conducted an environmental assessment ("EA") pursuant to NEPA in order to assess the probable environmental consequences of its actions.  TVA stated that it received 1,741 comment submissions from the public and other stakeholders regarding the probable environmental consequences of its proposed rate change.  After completing the study, TVA determined that its proposed rate change would not significantly impact the environment and issued a finding of no significant impact ("FONSI").  Because it found that the proposed rate change would not significantly affect the environment, TVA did not prepare the more intensive Environmental Impact Statement.[2]

---

[2] NEPA requires a federal agency to prepare the most intensive study, an Environmental Impact Statement ("EIS"), only when a major federal action is expected to "significantly" affect the quality of the human environment. 42 U.S.C. § 4332(C). An agency may prepare an EA for a proposed action in order to determine whether or not an EIS is needed. 40 C.F.R. §§ 1508.9, 1501.3, 1501.4(b) & (c). If, based on the EA, the agency determines that the impacts of the proposed action will not significantly affect the environment, then it issues a FONSI and an EIS is

## II. Plaintiffs' Complaint

In their complaint, the plaintiffs allege that TVA's EA did not meaningfully assess the environmental impacts of the 2018 rate change.   According to the plaintiffs, TVA violated NEPA by enacting the rate change based on an allegedly deficient EA in a manner that was arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.[3]   The plaintiffs also allege that TVA violated NEPA by failing to consider the environmental impacts of its rate change along with the reduction in the DG rate paid to customers who generate their own electricity, i.e. the changes to the GPP Program.   Additionally, the plaintiffs claim that the 2018 rate change, "(a) 'may establish a precedent for future action with significant effects'; (b) will have 'highly controversial' and 'highly uncertain' effects; (c) is related to other actions with cumulatively significant impacts; and/or (d) 'threatens a violation' of the TVA Act, 40 C.F.R. § 1508.27…."  (Doc. 1, at 24-25).  Based on those assertions, the plaintiffs claim that TVA was required to conduct an EIS and, by failing to do so, violated NEPA.

---

not required. 40 C.F.R. § 1501.4(c) & (e); 40 C.F.R. § 1508.13; *see generally Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756-58 (2004). "[T]he decision not to prepare an EIS is left to the 'informed discretion' of the agency." *Providence Rd. Cmty. Ass'n v. EPA*, 683 F.2d 80, 82 (4th Cir. 1982) (*quoting Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).

[3] Because NEPA does not have its own private right of action, NEPA suits are brought under the APA. *See, e.g., Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (noting that the APA "provides for judicial review of federal agency actions and allows federal courts to enjoin authorities of the United States government").

Finally, the plaintiffs claim that TVA violated NEPA by enacting the 2018 rate change before completing its 2019 Integrated Resource Plan ("IRP"). According to the plaintiffs, the 2019 IRP will address for the first time the availability and use of DER, the effects of power production on the environment, and how DER should be considered in TVA's planning.  By enacting the rate change before that IRP was complete, the plaintiffs say, TVA violated NEPA.

According to the plaintiffs, TVA's alleged failure to comply with NEPA will ultimately harm them by dis-incentivizing investments in DER, which, in turn, will increase reliance on TVA-generated power.  Plaintiffs further allege that this increased reliance will cause TVA to burn more fossil fuels which, in turn, will harm the environment in the areas where they live and recreate.  The plaintiffs have asked this Court to declare that TVA has violated NEPA and the APA; to set aside and remand the FONSI as well as TVA's 2018 rate change; and to order that TVA prepare an EIS regarding the rate change.

## III.   Standard of Review

As noted, the plaintiffs have filed a motion for summary judgment and the defendant has filed a motion for judgment on the administrative record.  Neither party addresses the appropriate standard this Court should use in deciding the case. However, as will be discussed, the Court finds that the plaintiffs lack standing.  To the extent TVA's motion seeks relief based on standing, the Court will treat the

motion as one under FED. R. CIV. P. 56.  "The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on ... mere allegations, but must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013)(internal quotations omitted).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "'Genuine disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant.  For factual issues to be considered genuine, they must have a real basis in the record.'"  *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).  "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment."  *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage.").  Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence.  *Feliciano*, 707 F.3d at 1252 (citing *Anderson,* 477 U.S. at 255).  However, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact.  *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In sum, the standard for granting summary judgment mirrors the standard for a directed verdict.  *Anderson*, 477 U.S. at 250 (citing *Brady v. Southern R. Co.*, 320 U.S. 476, 479–480 (1943)).  The district court may grant summary judgment when, "under governing law, there can be but one reasonable conclusion as to the verdict."

*Id.* at 250.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party . . . .  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id*. at 249–50 (internal citations omitted).

## IV.   Article III Standing

As a threshold matter, the Court must first address TVA's argument that the plaintiffs lack Article III standing to bring this lawsuit.  "Standing is a jurisdictional inquiry, and a 'party invoking federal jurisdiction bears the burden' of establishing that he has standing to sue." *Am. Civil Liberties Union of Fla., Inc. v. Dixie Cnty., Fla.*, 690 F.3d 1244, 1247 (11th Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  If the plaintiffs do not have standing, then the Court has no power to hear the case.  The United States Supreme Court has held that in order to meet the standing requirement of Article III of the United States Constitution, a plaintiff must establish the following:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

> (2) the injury is fairly traceable to the challenged action of the defendant; and

> (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  A plaintiff must establish all three elements in order to prove Article III standing.  At the motion to dismiss stage, the Court held that the plaintiffs had adequately alleged facts which, if true, would establish each element above.  However, the Court noted that the plaintiffs would ultimately be required to offer evidence supporting those allegations.

As noted, the plaintiffs in this case are organizations, not individuals.  The Eleventh Circuit has held that "'[a]n organization has standing to bring an action on its members' behalf if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."'  *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1279 (11th Cir. 2015), *quoting Am. Civil Liberties Union of Fla., Inc.*, 690 F.3d at 1248, *quoting in turn Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).  There appears to be no dispute as the last two elements.  Thus, the plaintiffs' standing depends on whether its individual members would have standing to sue in their own right.

To prove individual standing, the plaintiffs have submitted 12 affidavits from various members purporting to be harmed by TVA's rate change.  TVA argues that

none of these members have demonstrated their own individual Article III standing leading to the conclusion that the plaintiff organizations also lack standing. According to TVA, the individual plaintiffs have failed to prove an injury in fact that is fairly traceable to TVA's rate change.  TVA also contends that "[t]he speculative and attenuated chain of inferences necessary to arrive at Plaintiffs' alleged injury also doom their showing of causation."  (Doc. 44, p. 18).  The Court agrees and will discuss each element in turn, beginning with causation.

### a. Causation

TVA cites *Florida Audubon Soc'y v. Bentsen*, 94 F. 3d 658 (D.C. Cir. 1996)(en banc), a case from the D.C. Circuit, in support of its argument that the plaintiffs failed to show causation.  This Court finds *Bentsen* to be persuasive.  The court in *Bentsen* held that "an adequate causal chain must contain at least two links: one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one connecting that substantive decision to the plaintiff's particularized injury."  The plaintiffs have failed to prove the second link.

In *Bentsen*, the Treasury Department expanded certain tax credits in order to incentivize the use of gasoline-ethanol blends and another fuel additive derived from ethanol. The plaintiffs claimed that this would increase the demand for ethanol thereby incentivizing farmers to grow more corn, from which ethanol can be derived,

thereby leading to pollution and clearing of land for farming.  That pollution and land clearing, the plaintiffs claimed, would then result in environmental damage and damage to wildlife.  Like TVA here, the Treasury Department in *Bentsen* did not conduct an EIS regarding their expansion of the tax credit.  The plaintiffs similarly sought to compel the agency to perform the more in-depth study.

The D.C. Circuit held that the plaintiffs lacked standing.  Specifically, the court found that the plaintiffs failed to demonstrate an injury in fact because they failed to prove geographic nexus to any asserted environmental injury.  The court also found that plaintiffs failed to prove causation.   In its analysis of causation, the court held that "[s]uch a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury." *Id. at* 670.

The plaintiffs in the present case put forth a similar causation argument relating to TVA's rate change.  According to the plaintiffs, the rate change will disincentivize the adoption of DER, like rooftop solar, thereby causing fewer people to adopt those measures.  Because fewer people will adopt DER, TVA will burn more fossil fuels in its power plants than it otherwise would have in order to make up the deficit.  That increased use of fossil fuels will in turn lead to more pollution

and, consequently, to more harm to the plaintiffs' members' interests.  Thus, there are several links in the alleged chain of causation.

There is no dispute that TVA's power plants emit pollution when they burn fossil fuels to generate power.  It would follow that increased use of those plants would cause an increase in pollution.  However, it is the previous link, i.e., that decreased adoption of DER will lead to increased burning of fossil fuels, that the Court finds lacking.  Throughout their briefs, the plaintiffs have repeatedly stated this to be a fact.  For example, in their brief in support of their motion for summary judgment, the plaintiffs state that they have "presented the requisite record evidence demonstrating how changes in TVA's rate structures will impact DER investments – which means TVA will be generating electricity that would have otherwise come from clean energy sources."  (Doc. 38, p. 25); *see also* (Doc. 45, p. 12)(stating that decreased DER investment will "inevitably" lead to increased use of fossil fuel resources.)  According to the plaintiffs, "TVA does not seriously dispute that reduced levels of DER investment will inevitably mean more polluting fossil fuel emissions."  (Doc. 45, p. 9).  However, as noted in TVA's response, it does in fact "vigorously dispute that premise."  (Doc. 46, p. 4).

According to the plaintiffs' own complaint, TVA has been faced with "'flat or even declining' need for power…."  (Doc. 1, p. 18), *quoting* (Doc. 36-11, p. 1)(FONSI).  The plaintiffs' complaint also asserted that less than half of TVA's

power was generated by fossil fuels with approximately 25 percent of that coming from the coal-fired power plants the plaintiffs' members complain of.  In TVA's 2019 Integrated Resource Plan, it notes that its energy portfolio has become more diverse over the past decade.  (Doc. 44-1, p. 5).  The executive summary of the IRP provides that 54 percent of TVA's power generation is carbon free, utilizing nuclear power, natural gas, hydroelectric, wind, and solar power.  *Id.*  The plaintiffs have pointed to no evidence suggesting any likelihood that TVA would necessarily choose to use its coal-fired plants as a substitute for the solar power that would have been generated from increased consumer investments in DER.  Rather plaintiffs merely state, *ipse dixit*, that a decrease in DER investment will necessarily lead to the increased use of fossil fuels to make up the deficit.  There is simply no evidence of that.

The Court inquired about this assertion at the hearing on these motions.  The Court asked plaintiffs' counsel: "I know your position is it's inevitable that [the rate changes] will result in increased burning of fossil fuels.  But tell me the true hard proof on that, other than this is kind of what we foresee, this is -- this is our belief." (Transcript of motion hearing, p. 15).  Counsel responded, "I can't tell you that the specific solar array by a particular company is going to lead the power plant to run less on a specific day."  (Transcript of motion hearing, p. 16).  He further stated:

> [W]e have TVA fossil fuel resources that are generating pollution. There's no dispute. And we have TVA taking affirmative actions to try

and discourage the energy generation that would be the substitute for
that fossil fuel generation. And I think that's all we -- need both under
standing law and under NEPA.

(Transcript of motion hearing, p. 16).  That answer presents the same problem

because if presupposes that DER "would be the substitute for that fossil fuel

generation."  But the plaintiffs have pointed to no evidence that TVA is more likely

to use fossil fuels, as opposed to some other resource in its energy portfolio, as a

substitute for the energy that would have been produced via DER.

During the exchange cited above, plaintiffs' counsel referenced *Black
Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1279

(11th Cir. 2015), where, he said, "there were similar arguments about uncertainty of

the power plant impacts." (Transcript of motion hearing, p. 15).  Plaintiffs also cited

this case in their motion for summary judgment to support their argument that their

injuries were fairly traceable to the new rate structures.  The plaintiffs asserted that

*Black Warrior Riverkeeper* was "on all fours" with the present case.  However, the

Court finds that case distinguishable.

In *Black Warrior Riverkeeper*, the Eleventh Circuit held that "a plaintiff need

not prove that their injury can be traced to specific molecules of pollution emitted

by the alleged polluter.  It is enough that a plaintiff show that a defendant discharges

a pollutant that causes or contributes to the kinds of injuries alleged in the specific

geographic area of concern."  781 F. 3d at 1280 (internal quotations omitted).  The

court noted that the plaintiffs satisfied their burden of proving causation because they alleged that their members "use[d] areas downstream from the forty-one stream-filling operations grandfathered under the [challenged permit]." *Id.*

However, the chain of causation in *Black Warrior Riverkeeper* had one less link. There, the plaintiffs alleged a procedural injury regarding a permit that directly allowed the defendants to discharge pollutants into a river they used. In the present case, the alleged procedural injury is one step removed from the alleged pollution. The plaintiffs contend that the rate change has the direct effect of disincentivizing the adoption of DER which will *then* cause TVA to emit more pollution. The rate change at issue did not mandate or explicitly allow for TVA burn more fossil fuels. Rather, it had an effect on peoples' behavior. That behavior, i.e., not adopting DER, will allegedly cause TVA to burn more fossil fuel. This is the link in the chain of causation that the plaintiffs are unable to prove. Thus, *Black Warrior Riverkeeper* is distinguishable from the present case.

The plaintiffs also cite to *American Fuel & Petrochemical Manufacturers v. Envtl. Prot. Agency*, 937 F.3d 559, 568 (D.C. Cir. 2019), for the same proposition. However, that case is distinguishable as well. In *American Fuel*, the plaintiffs challenged Congress' "Renewable Fuel Program" which was designed to increase the production of clean renewable fuels, such as biofuels, created from agricultural products. In that case, the plaintiffs alleged that the program would lead farmers to

grow more crops for biofuels, which in turn would harm imperiled species.  The defendants in *American Fuel* argued that the plaintiffs lacked standing because, among other things, their proof of causation relied on "predictive assumptions" and the impact of "uncertain incentives."  *Id.* at 595.

The D.C. Circuit rejected the defendant's argument because the plaintiffs had provided evidence that the biofuels program had led to changes in crop production that impacted species of concern.  *Id* at 595 ("We have a decade's worth of information, including the EPA's own Triennial Report, on the effects of the Program's annual standards.").  The court also distinguished that case from its earlier decision in *Bentsen*.  The court held that, unlike the challenged tax credits in *Bentsen*, "those standards do not simply establish uncertain tax incentives that might lead third parties to take actions that harm habitats, but rather directly regulate biofuel producers who are 'before this court.'"  *Id.*, quoting *Bentsen,* 94 F. 3d at 670.  Again, the chains of causation in these cases are distinguishable.

In the present case, the rate change allegedly has the indirect effect of disincentivizing DER while in *American Fuel*, the challenged regulation directly affected the biofuel producers by specifically requiring them to produce more biofuels.  Also, there appeared to be no dispute that increased production of biofuels required an increase in the amount of crops that would have to be farmed.  TVA's rate change does not directly regulate anyone, i.e., it does not require or forbid

anyone from installing solar panels or adopting any other clean energy measure. Moreover, the plaintiffs in this case have pointed to no evidence like the "decade's worth of information" noted in *American Fuel* to prove their assertion that a decrease in DER investment will necessarily lead to an increase in fossil fuel use. Accordingly, the Court finds no genuine issue of material fact as to whether the plaintiffs' "injur[ies] [are] fairly traceable to the challenged action of the defendant." *Friends of the Earth, Inc.*, 528 U.S. at 180 (2000).

### b. Injury in Fact

Even if the plaintiffs could prove a link between decreased DER investment and an increase in the use of fossil fuels by TVA, they have still failed to show the requisite geographic nexus between the alleged pollution and their particular interests. In support of their contention, plaintiffs have submitted affidavits from several of their members who assert that TVA's coal-fired power plants harm the environments in which they live and recreate. *See* (Docs. 38-2 to 38-13). These affidavits certainly allege that the plaintiffs' members are harmed by pollution from TVA's coal-fired power plants. *See e.g.* (Doc. 38-7)(Declaration of Christopher Irwin explaining that when the plants run, they emit pollution that "harms me, my family, and other residents of the Knoxville area" and that his "enjoyment is diminished by the air and water pollution emitted by the power plants there.").

However, the declarations fail to establish any nexus between the rate change and increased pollution at a specific power plant. As noted, TVA operates coal-fired power plants in order to supply energy to customers across seven states. Even if the plaintiffs could establish that decreased DER investment would lead to increased fossil fuel use, they have, at best, shown that it would generally affect a seven-state area. Such a large geographic area cannot support Article III standing. *See Ctr. for Biological Diversity v. United States Envtl. Prot. Agency*, 937 F.3d 533, 539 (5th Cir. 2019)("A geographic area as big as the 'Western and Central portions of the Gulf' cannot support Article III standing."). The plaintiffs have pointed to no evidence that would connect the rate change to the increased use of a specific power plant.

Unlike the plaintiffs in *Black Warrior Riverkeeper* who were able to tie the challenged permit to specific discharges into a river upstream from their locations, the plaintiffs here have merely surmised that if investments in DER decrease, then it must follow that a coal-fired plant near them will run longer than it otherwise would have thereby causing an injury. They have simply pointed to no evidence that this is so. Accordingly, even if they had been able to prove causation, they would still lack standing because of their inability to show an "'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc.*, 528 U.S. at 180 (2000).

## V. Conclusion

Because the Court has determined that the plaintiffs failed to prove an injury in fact and causation, the plaintiffs have failed to demonstrate Article III standing. Therefore, the Court need not address the redressability prong of the standing analysis. Further, because the plaintiffs lack standing, the Court lacks the power to decide the merits of their NEPA challenge. "For the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011). Accordingly, the Court stops its analysis here and makes no findings or conclusions regarding the propriety of TVA's decision to forgo an EIS.

For the foregoing reasons, TVA's motion (Doc. 43) is **GRANTED**, and the plaintiffs' motion (Doc. 37) is **DENIED**. Because the plaintiffs lack standing, the Court has no subject-matter jurisdiction. Accordingly, this case is **DISMISSED WITHOUT PREJUDICE**. A separate order will be entered.

**DONE** and **ORDERED** September 30, 2020.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE